THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MICHAEL RICHARDSON *et al.*, Defendants-Appellants.

First District (3rd Division)    No. 77-587

Opinion filed June 14, 1978.

James J. Doherty, Public Defender, of Chicago (Timothy P. O'Neill, Assistant Public Defender, of counsel), for appellant Michael Richardson.

Ralph Ruebner and Kenneth L. Jones, both of State Appellate Defender's Office, of Chicago, for appellant Ernest Jenning.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger, Kenneth T. McCurry, and Carol A. Kearney, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE SIMON delivered the opinion of the court:

Codefendants Michael Richardson and Ernest Jenning were tried together before a jury, and found guilty of burglary, armed robbery, and deviate sexual assault involving two women which occurred on February 11, 1976. They both were sentenced to serve 5 to 15 years for burglary and two concurrent terms of 40 to 65 years for armed robbery and deviate sexual assault, with the burglary sentence to be served concurrently with the other sentence. Although Richardson also was found guilty of unlawful restraint, he was not sentenced for this offense. The two defendants have filed separate briefs on appeal; Richardson has appealed only his convictions, while Jenning has appealed the length of his sentence, as well as his convictions.

Several parts of the proceedings which occurred prior to the trial are relevant to this appeal. First, on the day the case was set for trial, and after Richardson had previously been warned that he would not be granted any further continuances, his counsel asked the court to conduct a fitness hearing for his client. The State objected to this and, in response, introduced a transcript of a hearing which had occurred 2 weeks earlier, and contained a colloquy between Richardson and the trial judge as to whether Richardson was prepared for trial. The State also pointed out

that Richardson had been in court eight times previously, and never had requested a competency hearing.

Richardson's counsel then informed the court that Richardson could not help in the preparation of his case, and that from 1972 to 1973 Richardson had been hospitalized in the Tinley Park Mental Health Center. The counsel stated that a Cook County sheriff's record concerning Richardson's admittance into the county jail on June 5, 1975, indicated that Richardson had attempted suicide.

After stating that he had observed the conduct and demeanor of Richardson, and had heard the transcript of proceedings which took place 2 or 3 weeks previously, the trial judge ruled that Richardson understood the nature of the charges and was able to cooperate with his counsel. Therefore, he denied Richardson's request for a fitness hearing. Subsequent motions presented by Richardson's counsel for a psychiatric examination—one before trial, one during trial, and three after judgment was entered—also were denied.

On the next day, the trial judge held a hearing on Richardson's motion to suppress a statement he had made during post-arrest questioning by the police. At that hearing, Officer Frank Goff testified that he shot at Richardson in the apartment where the crimes took place. Officer Goff stated that although he saw Richardson fall back after the shot, at that time he had no idea that Richardson had been shot. Officer Goff further said that after the shooting, he handcuffed Richardson, placed him under arrest, and transported him to the police station.

At this hearing, Officer Goff also testified that he questioned Richardson at the police station after the arrest. During this questioning, Officer Goff said they were seated at a table in front of the interrogation room while two other policemen were conversing at the back of the room about 20 feet away. According to Officer Goff's testimony, neither of the other policemen took part in the conversation. Officer Goff testified that after Richardson had been advised of his rights, and Richardson admitted he understood them, he asked Richardson what he was doing in the apartment, and Richardson made an oral admission. Officer Goff stated that, after taking Richardson to the station, he discovered that Richardson had been grazed by a bullet at the apartment, but that there was no evidence of a wound, and Richardson never told anyone he had been shot until he reached the police station. Finally, Officer Goff testified that Richardson made his admission, and was then taken to the hospital for treatment.

Officer Goff was the sole witness at this hearing on the motion to suppress, at which Richardson failed to object to the fact that the two other policemen did not testify. Richardson did not testify at this hearing.

After hearing Officer Goff's testimony, the trial judge ruled that Richardson had made a voluntary statement to Officer Goff with knowledge and understanding of his rights. The trial judge then denied Richardson's motion to suppress the statement.

At trial, testimony was heard from the two complaining witnesses, the victim of the sexual assault (herein referred to as "the victim") and her roommate (herein referred to as "the roommate") who shared an apartment on the date of the offense. The victim testified that at about 7 p.m. that evening, as she was returning to the apartment after doing some grocery shopping, she noticed two men following her. She walked the 5½ blocks to her apartment, but as she entered the courtyard of her building, one of the men asked her what time it was. She looked at her watch and then saw that one of the men was holding a gun. She identified Jenning and Richardson as the two men, testifying that Richardson held the gun and did all the talking.

The victim then was ordered into the vestibule, and Jenning obtained her billfold from the bag of groceries she had been carrying. He took the money out and gave it to Richardson. Richardson demanded the victim's watch and then asked if she lived alone. She said that she did not live alone, and, in response to Richardson's questions, said that her roommate was a female who was probably not in the apartment. Richardson next ordered the victim to take them to the apartment.

Her roommate testified that when the victim and the two men entered the apartment, she was talking on the long-distance telephone to her mother in Maine. In her trial testimony, the roommate identified the two men as Richardson and Jenning. After seeing Richardson, the roommate exclaimed, "Oh, my God, he has got a gun." Richardson then announced a holdup and ordered her to hang up, and she obeyed him.

The roommate's mother testified that at the time in question she was in the State of Maine, talking on the telephone with her daughter. After her daughter hung up, the mother called the Chicago police to report the conversation with her daughter, and the police informed her they would "call her back and let her know."

The testimony of both women established that after the roommate hung up the phone, Jenning picked up her pocketbook and emptied its contents on the bed. Jenning took a jackknife and some traveler's checks. When the phone rang, Richardson told the roommate not to answer it. The victim asked if she could put her groceries down and Richardson followed her to the kitchen.

Jenning then pulled the phone out of the wall. He led the roommate into the living room where he pulled another phone out of the wall, and then took the roommate back to her bedroom. Richardson and the victim returned to the roommate's bedroom, and Richardson told Jenning to tie

up the roommate, stating, "I am going to shoot her right now." However, though Jenning pulled down the window shade, he was unable to find any rope, and the roommate was never tied up. Richardson and the victim then returned to her bedroom while Jenning watched the roommate. Jenning asked the roommate if she wanted to go to bed with him, and when she refused, he put his hand in her bra and down her pants, looking for money. In the meantime, in the bedroom, Richardson threatened the victim, ordered her to disrobe, and compelled her to commit a deviate sexual act. He then left the room, stating that if the victim moved he would shoot her.

Richardson returned to the other bedroom, grabbed the roommate, threatened her with a gun and ordered her to kiss him. Richardson then struck her in the face with his gun. As she fell to the floor he hit her again on the back. Richardson told Jenning to tie the roommate up so he could kill her. Jenning then told Richardson to leave and that he would take care of the roommate himself.

The roommate testified that after Richardson left, Jenning said, "See how nice I am. Don't you want to go to bed with me?" She again refused and suggested that they go cash the traveler's checks at a grocery store. Jenning talked with Richardson and decided to go with the roommate to cash the checks. Richardson told her she had better hurry because Jenning had a gun in his pocket, and if she was not back in 3 minutes he (Richardson) would kill the victim. The roommate did not know whether Jenning had a gun but said that he kept his hand in his pocket.

The victim testified that after Jenning and her roommate left, Richardson made her lie on the bed and he performed another deviate sexual act. She heard noise in the courtyard and then the buzzer in her apartment rang. Richardson told her to go to the door and tell whoever it was that she was in the tub. She went to the door, followed by Richardson, who was pointing a gun at her head. She opened the door, ran out, yelled for help, and saw that there were several police officers at the door.

Officer Goff testified that after ordering Richardson to drop his gun, Richardson aimed at him and tried to slam the door. Officer Goff fired once through the doorway, but did not know at the time whether he had shot Richardson. At this time, Richardson did not mention that he had been shot, nor did Officer Goff notice a wound or blood on Richardson.

After the victim described Jenning and her roommate, she directed the police to the supermarket where they had gone. There, while the roommate was cashing the checks, two uniformed policemen approached her, asked her address and then arrested Jenning. Officer Charles Brown testified that after arresting Jenning in the liquor store, he searched him and found two knives in his outside pockets. One of the knives was open.

Officer Brown also found Mexican money, two watches and keys which the roommate identified at trial as the items taken from her bedroom by Jenning.

Officer Goff further testified that after Richardson had been taken to the police station, Officer Fashingbauer conducted a strip search of Richardson. Officer Fashingbauer testified that his strip search revealed little, if any, bleeding from the flesh wound on Richardson's side. According to Officer Goff's testimony, this strip search was the first the police knew of any wound to Richardson. Officer Goff promptly called a wagon to take Richardson to the hospital for treatment. It was at this point, Officer Goff said, that he read Richardson his rights for the second time, and Richardson made the oral admission, "I was there to rob her." Hanumanuh Rao, the physician who treated Richardson at the hospital emergency room, testified that Richardson had an abrasion on his left side, with no bleeding.

Richardson testified on direct examination that he was not at the complaining witnesses' address the day of the crime, and did not assault the victim or take any of her property. On cross-examination, he claimed he was buying cigarettes at a drugstore, and that earlier he had told his attorney that he was not at the scene of the crime, though he did not then tell his attorney that he was at a drugstore when the crime occurred. He also said he did not know Jenning until he met him in jail.

After the jury verdict and before sentence was passed, the trial judge stated that he had observed Richardson throughout the trial and found him lucid and aware of the proceedings.

On appeal, Richardson contends that (i) the trial court erred in not holding a hearing on his fitness to stand trial, (ii) the court erred in allowing into evidence the oral statement he made during interrogation because he was suffering from a bullet wound, (iii) the prosecution's failure to produce the two other police officers connected with his statement as material witnesses was reversible error, (iv) trial testimony indicating that he remained silent during his interrogation violated his fifth amendment right to remain silent, and (v) the prosecution's use of his pretrial silence violated his fourteenth amendment due process rights.

Jenning argues that the trial court erred in holding him legally accountable for Richardson's independent acts of deviate sexual assault, which were not done to further the defendants' plan of committing armed robbery and burglary. He also claims that his lesser degree of culpability should result in a reduced sentence.

We reject Richardson's and Jenning's arguments, and affirm their convictions and sentences, as adjudicated by the trial jury and imposed by the trial judge.

■■ The trial court did not err in refusing to grant a hearing to determine

whether Richardson was fit to stand trial because no bona fide doubt existed as to his competency. As a general rule, a court should order a competency hearing only where a bona fide doubt exists that a defendant is able to understand the nature and purpose of the proceeding and to assist in his defense. (*People v. Hammond* (1970), 45 Ill. 2d 269, 276, 259 N.E.2d 44.) This decision is largely within the discretion of the trial court and will be reversed only if there is an abuse of discretion. *People v. Southwood* (1971), 49 Ill. 2d 228, 230, 274 N.E.2d 41.

Neither before nor after trial did Richardson's conduct raise a good-faith issue as to his competency to stand trial. Regarding his pretrial conduct, the transcript of one of Richardson's pretrial hearings read to the trial judge when Richardson's counsel first requested a competency determination shows that Richardson was aware of the nature of the proceedings. At that pretrial hearing, Richardson stated he was ready for trial. When asked if he wanted a jury trial he asked if he would be allowed to pick his own jury. Richardson then stated that he wanted a jury trial and that he wanted a bar association lawyer to represent him. He also stated a lawyer by the name of John was going to assist him in trying the case.

Thus, as the trial judge stated when he denied Richardson's motion for a competency hearing, Richardson knew what proceedings were taking place before trial. Richardson asked lucid questions about his right to pick out a jury, stated that he wanted a motion for discovery and stated he had petitioned to have a bar association lawyer appointed. The fact that he could not remember the last name of the attorney who was going to assist him does not show that he was incompetent.

Nor did Richardson's testimony at trial raise any bona fide doubt as to his competency. There, he merely asserted that he was not arrested at the scene of the alleged crimes but rather that he was arrested while buying cigarettes. He denied being at the site of the crime on the date in question and denied that he committed the alleged crimes. Richardson never changed his story on the witness stand or contradicted himself, and the mere fact that he chose to testify when the evidence overwhelmingly contradicted him does not show he was incompetent. In view of the strong previous testimony against him, he may have felt his only chance of being acquitted was to take the stand, deny the charges and testify he was elsewhere when the crimes took place.

■■ Richardson also claims that his attorney's statement on the day of trial, that he had no recollection of the charges placed against him, shows he was incompetent to stand trial. However, the mere allegation that a defendant cannot remember the alleged criminal occurrence has been held insufficient to raise a bona fide doubt of competency. (*People v. Pridgen* (1967), 37 Ill. 2d 295, 298-99, 226 N.E.2d 598.) In *Pridgen*, the

defendant's counsel informed the trial court on the day of trial that the defendant was unable to remember anything about the crimes he was charged with and therefore was unable to cooperate with counsel in his defense. The trial court denied the defendant's request for a competency hearing, and the supreme court held that the defendant's mere assertion that he could not recall anything about the alleged burglary, coupled with his counsel's statement that the defendant was unable to help in the preparation of a defense, was not sufficient to require a competency hearing. The reviewing court's affirmance relied on the trial judge's statement that he felt the defendant was lying about the amnesia and that he seemed to remember things he wanted to remember when he thought it might help him.

The facts in the present case are similar to those in *Pridgen*. Richardson appeared in court on eight occasions prior to trial and at no time did his attorney inform the court he was having difficulty communicating with his client. Then, the day the case was to go to trial, his attorney told the trial judge that when he spoke with Richardson the previous day, he had no recollection of the charges against him and would not cooperate in preparing a defense. Richardson's self-serving claim that he could not remember anything about the alleged crimes and that he refused to cooperate were not sufficient to raise a bona fide doubt that he was not competent to stand trial, especially when the trial judge indicated this was a delaying tactic by the defense attorney. *People v. Skorusa* (1973), 55 Ill. 2d 577, 582-83, 304 N.E.2d 630; *Pridgen*.

■■ The only other allegations Richardson made to show he was incompetent were that he had been in a mental health center from 1973 to 1974, and that he attempted suicide while in jail. Evidence that a person was in a mental institution does not raise an issue of competency. In *People v. Richeson* (1962), 24 Ill. 2d 182, 184, 181 N.E.2d 170, the evidence showed that less than 2 years before trial the defendant had been committed to a mental institution from which he escaped 1 month after his commitment. The court held that:

> "Although commitment to an institution may indicate that the individual needs some form of psychiatric treatment, it does not follow that he lacks the mental capacity to stand trial."

Similarly, the supreme court has found no bona fide doubt of incompetency where the defendant possessed a sociopathic personality and suffered from psychiatric and social disturbances. (*Hammond*, at 277.) Thus, Richardson's institutionalization over 3 years before trial and his attempted suicide were insufficient to raise a bona fide doubt that he was incompetent.

Here, the trial judge had the opportunity to observe Richardson's demeanor and conduct throughout the trial. When his attorney

requested a competency hearing after Richardson testified, the court observed:

> "Throughout this proceeding, * * * by motions filed pro se by the defendant, petitions filed and brought into court every day, his mannerism on the stand, he is very lucid. He understood, he knew what was going on. * * * It's merely dilatory on the part of the defendant * * *."

After the verdict, Richardson's attorney again requested a competency hearing. The court refused, commenting:

> "There has been nothing shown to the court except statements for examination. There must be something brought to the attention of the court, some bona fide showing before the court, in its discretion, gives these examinations that you are requesting.
>
> There has been no showing whatsoever to this court, the court has observed this defendant. * * * [H]e is very lucid, he knows what's going on; in fact I heard him this morning, * * * just before that jury was brought into this courtroom, he asked you, I heard him from here, from the bench, he asked you * * * 'Have they arrived at a verdict? What is the verdict, guilty or not guilty * * *.'
> * * *
>
> Based on his own observation, knowing what's going on, being aware of the procedure, being aware of the facts that are being presented in this court and the basis of the trial and his own taking of the stand and the answers that he gave and the observation of this court, your motion is denied."

■■ Thus, the trial judge carefully observed Richardson throughout the hearings and trial, and arrived at an informed and reasonable opinion on the issues of Richardson's ability to understand the proceedings and assist his defense. Nothing in the record demonstrates that Richardson was not competent to stand trial; on the contrary, the record indicates that he was lucid and aware of what was going on. Consequently, we cannot say that the trial judge abused his discretion in denying a competency hearing

■■ Richardson's second argument, that his oral admission to the police officer during interrogation was involuntary because he was in great pain caused by an untreated bullet wound, is not valid. Officer Goff testified that he read Richardson his *Miranda* warnings from a preprinted card after Richardson had been searched by Officer Fashingbauer and before the interrogation which resulted in Richardson's admission. Officer Albert Fashingbauer testified that although he noticed a flesh wound on Richardson's left rib area when he performed a strip search at the police station, he noticed very little, if any, blood. Both officers testified that Richardson did not complain of being wounded at any time before he

was searched. The doctor who treated Richardson at the hospital testified that the wound was a graze wound, similar to a severe scrape, without bleeding, which could have been made by something other than a bullet. Thus, the testimony at trial indicated that Richardson was advised of his rights, and had suffered a slight and superficial wound with minimal bleeding which was not even noticed until he was searched at the police station. The record shows that he did not complain of the pain he was suffering, or mention his wound, or request to be taken to the hospital. Under these circumstances, we conclude that there was no evidence any pain Richardson may have suffered was enough to overcome his ability to understand either the warnings or the implications of his oral statement to Officer Goff. Even if we were to consider only the testimony of Officer Goff who was the witness at the hearing on Richardson's motion to suppress his admission, we would conclude that through Officer Goff's testimony the State made a prima facie showing that the admission was voluntary and that Richardson offered no evidence to overcome that showing. The trial judge did not err in concluding that the admission was voluntary, for there was no evidence Richardson's will was overborne by pain or that he made his statement in order to receive medical attention. *People v. Pittman* (1973), 55 Ill. 2d 39, 302 N.E.2d 7; *People v. Walden* (1976), 43 Ill. App. 3d 744, 751-52, 357 N.E.2d 232.

■■ Next Richardson contends that he was prejudiced by the State's failure to produce two witnesses at the hearing on the motion to suppress evidence of his admission who were present during his interrogation. Both an Officer Kulerowskis and an Investigator Raddatz were, according to Officer Goff's testimony at the hearing on the motion to suppress, in the same room when Richardson made his admission. However, Officer Goff also stated that neither of these two officers sat at the table where he was questioning Richardson, or participated in the interrogation. He testified further that they were about 20 feet away from where he and Richardson were conversing. There was, consequently, no indication that the testimony of either of these officers would have produced any evidence material to the issues of the voluntariness of his admission. (*People v. Hilliard* (1974), 19 Ill. App. 3d 124, 311 N.E.2d 193.) In any event, Richardson's failure to make the statutorily required objection to the absence of these two witnesses waived any error that may have occurred. Ill. Rev. Stat. 1975, ch. 38, par. 114—11(d).

■■■ Richardson's fourth contention, that he was deprived of his fifth amendment right to remain silent by the prosecution's use at trial of his pretrial silence, also is without merit. The allegedly prejudicial exchange occurred at trial, when the prosecutor asked Officer Goff, "Officer, did he [Richardson] say anything further at that point [after making his oral admission that he was in the apartment to rob the women]?" Officer Goff

then responded, "I wanted him to sign a statement but he just waved his hand." Richardson's attorney promptly objected, and the jury was instructed to disregard this testimony.

We do not believe any error occurred here. Richardson was not silent before trial; instead, he made a voluntary and damaging admission during his interrogation. What was used against him at trial, then, was not his legitimate exercise of his fifth amendment right to remain silent, but his refusal to sign a statement which presumably would have put his oral admission into writing. Accordingly, no violation of Richardson's fifth amendment privilege against self-incrimination took place when Officer Goff offered his nonresponsive answer. And, in any event, any error which may have occurred was corrected by the defense counsel's timely objection, and the judge's actions in sustaining the objection and instructing the jury to disregard the answer. *People v. Kirkwood* (1959), 17 Ill. 2d 23, 31, 160 N.E.2d 766; *People v. Johnson* (1973), 11 Ill. App. 3d 745, 749, 297 N.E.2d 683.

■■ Richardson's last assertion is that his fourteenth amendment due process rights were violated when he was cross-examined at trial and asked whether he previously told anyone the exculpatory story that he was buying cigarettes at a drugstore when the crimes allegedly occurred. This claim is devoid of substance, for, rather than being impeached by his pretrial and post-arrest silence, as he claims, Richardson merely was impeached by his prior inconsistent statement. What was used against him was not his silence, but rather, the conflicting stories he told which were used to cast doubt on the story he gave at trial. Here, Officer Goff testified that after his arrest and while at the police station, Richardson said he was at the victims' apartment to rob them. At trial, however, Richardson testified differently, stating that he was at a drugstore buying cigarettes when the crimes took place. Clearly, Richardson's statements were inconsistent. A criminal accused's prior inconsistent statement may be used to impeach the credibility of his trial testimony. (*People v. Queen* (1974), 56 Ill. 2d 560, 564-65, 310 N.E.2d 166.) Like any witness, Richardson was open to questioning aimed at revealing the inconsistency between the admission Officer Goff testified he made before trial, and the alibi he gave at trial. Richardson's reliance on *Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240, is misplaced because the court there was dealing with a defendant who made no statement before trial, but chose to remain silent. Similarly, *People v. Wright* (1975), 32 Ill. App. 3d 736, 336 N.E.2d 18, is inapplicable because there the defendant was questioned at trial as to why he did not tell anyone of his theory of self-defense. Here, Richardson did not exercise his right to remain silent—he admitted his guilt after arrest, and changed his story at trial. The prosecutor properly questioned him about that inconsistency. *People v.*

*Eubanks* (1977), 55 Ill. App. 3d 492, 495, 371 N.E.2d 92; *People v. Lewis* (1977), 51 Ill. App. 3d 109, 366 N.E.2d 446.

We turn now to Jenning's claims that the trial court erred in finding him legally accountable for his codefendant's acts of deviate sexual assault, and that he is entitled to a reduced sentence.

As to his first contention, we find that the trial court properly held Jenning accountable for his codefendant's acts of deviate sexual assault. The circumstances under which a person may be held legally accountable for the conduct of another are set out in section 5—2(c) of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 5—2(c)), which states that a person is legally accountable if, with requisite intent, "he solicits, aids, abets, agrees or attempts to aid" the other person in planning or committing the offense. The supreme court in *People v. Kessler* (1974), 57 Ill. 2d 493, 497, 315 N.E.2d 29, interpreted this statute to mean that:

> "* * * where one aids another in the planning or commission of an offense, he is legally accountable for the conduct of the person he aids; and that the word 'conduct' encompasses any criminal act done in furtherance of the planned and intended act."

Quoting its opinion in *People v. Cole* (1964), 30 Ill. 2d 375, 379, 196 N.E.2d 691, the court went on to note that one may aid and abet without actively participating in the overt act. In addition, the court ruled in *People v. Washington* (1962), 26 Ill. 2d 207, 209, 186 N.E.2d 259:

> "[I]f the proof shows that a person was present at the commission of the crime without disapproving or opposing it, it is competent for the trier of fact to consider this conduct in connection with other circumstances and thereby reach a conclusion that such person assented to the commission of the crime, lent to it his countenance and approval and was thereby aiding and abetting the crime."

■■ Here, Jenning was aware of Richardson's assaults on the victim, yet he stood by and did nothing to oppose Richardson's conduct. Also, he actively aided Richardson in assaulting the victim by guarding her roommate while the assault was taking place. He disconnected both phones in the apartment to prevent the women from obtaining help, thereby giving Richardson time to complete the deviate sexual assaults without fear of outside interference. In addition that both defendants were pursuing a joint plan to engage in sexual activities in the apartment is shown by their going to the apartment after forcing the victim to tell them her roommate was a female, and by Jenning's suggestions to the roommate that they go to bed—from which he was apparently dissuaded only by her countersuggestion that he could obtain $100 more if he cashed the traveler's checks. Jenning did not lack the statutorily required intent to aid his cohort, and in fact aided and abetted him in a plan to commit

sexual assaults in the apartment. Accordingly, the trial court did not err in holding Jenning legally accountable for Richardson's actions. *Kessler; Cole; Washington*; Ill. Rev. Stat. 1975, ch. 38, par. 5—2(c).

■■ Nor is Jenning entitled to a reduction from the sentence imposed by the trial judge, of two concurrent terms of 40 to 65 years for armed robbery and deviate sexual assault, and a concurrent 5 to 15 year sentence for burglary. Jenning's conduct of robbing two women at gunpoint, invading their apartment and terrorizing them for 45 minutes while aiding his accomplice in a deviate sexual assault warranted the sentences meted out.

The imposition of a sentence lies in the discretion of the trial judge, who is in a better position than a court of review to determine the severity of the sentence. Absent an abuse of this discretion, a sentence should not be altered on review. A judgment as to the proper sentence should be based upon the particular circumstances of the case, including such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment and age. *People v. Perruquet* (1977), 68 Ill. 2d 149, 154, 368 N.E.2d 882.

The record in the present case discloses that the trial judge properly exercised his discretion. He noted that a sentence should accomplish several goals including deterrence, rehabilitation of the offender and protection of society. The judge also noted the factors to be considered in imposing a sentence, such as the nature of the charges, and the history, age and remorse of the individual to be sentenced. He then recalled the circumstances of the crime and the mental anguish and humiliation the two women suffered during the 45 minutes Jenning and Richardson terrorized them. The judge also took into consideration the defendant's conduct at trial and at the sentencing hearing, stating:

"There has been no outward manifestation either during the trial or here in court today, which is in one of the signs for rehabilitation insofar as any remorse."

Jenning claims that because Richardson was the more active offender, his own identical sentence was excessive. However, Jenning's role in the perpetration of the crimes warranted a sentence as severe as that of his codefendant. It was Jenning who took the money from the victim's wallet and who took several items from the roommate's purse and drawers. Jenning stood by while Richardson repeatedly threatened both women with death. When Richardson told defendant to tie the roommate up so he could kill her, Jenning pulled down the shades and looked for rope. It was Jenning who disconnected both phones to prevent the women from obtaining help, and who put his hand down the roommate's bra and pants looking for more money. He also tried to engage her in sexual activity.

Though Jenning also contends that the sentences he received were too

severe because the victims did not suffer permanent physical harm, this statement ignores the mental anguish and humiliation inflicted upon two women by the defendants. The trial judge did not abuse his discretion in imposing sentence on Jenning, and this court finds no justification for intervening to reduce the sentence he imposed.

Judgments affirmed.

JIGANTI, P. J., and McNAMARA, J., concur.