THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GEORGIA BIVINS, Defendant-Appellant.

First District (5th Division)    No. 80-1141

Opinion filed June 12, 1981.

Ralph Reubner and Paul R. Shuldiner, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Mark E. Thompson, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Following a jury trial, defendant was found guilty of murder and conspiracy to commit murder (Ill. Rev. Stat. 1973, ch. 38, pars. 9—1 and 8—2) and sentenced to a term of 30 to 90 years.

On appeal, defendant contends that she was: (1) denied due process of law when the court failed to hold a competency hearing to determine her fitness to stand trial; (2) denied a fair trial when the State withheld exculpatory evidence; and (3) denied her right to a speedy trial. We affirm.

In view of the fact that defendant has not raised any question concerning the sufficiency of the evidence, only a brief recitation of the facts is necessary.

In February of 1974, Paul Bivins, the victim, and defendant, Georgia Lee Bivins, were living apart as a result of marital difficulties. On February 23, 1974, defendant and two of her sons, Ricky and Clark Puckett, went to the apartment of Richard Covelli. Besides Covelli, present in the apartment were Covelli's girlfriend Linda and her two children, another woman and a man named Mouse. Defendant had been drinking prior to entering the apartment and had been hospitalized the week before for alcoholic gastritis.

At the apartment defendant stated that she would pay someone to kill her husband. Covelli responded that he knew someone who would do it. Defendant asked Ricky to inquire about the cost. After some discussion, Ricky told defendant that the price would be $300. Defendant agreed to pay a bonus of $200 if the murder was done right. The price was set at $500 and Covelli stated that the murder was guaranteed.

Shortly thereafter Richard Rashid ("Rabbi") arrived at Covelli's apartment. After a private conversation, Covelli and Rabbi agreed to do the killing and defendant gave them $50 as a down payment. At this point everyone left the apartment and went to a bar.

At the bar Ricky drew a diagram of Paul Bivins' office for Covelli. He also gave Covelli a key to the office and a photograph of Paul Bivins.

On the afternoon of February 25, Covelli and Rabbi instructed defendant, her two sons and two other women to go and wait at a bar on Milwaukee Avenue while they went to Paul Bivins' office. After receiving two phone calls at the bar, defendant announced that Paul Bivins had been shot. She gave her son Ricky $450 to give to the person it belonged to and left for the hospital. Ten or fifteen minutes later Covelli arrived at the bar and Ricky gave him the $450. Covelli and Rabbi then described the shooting and told the others where they had hidden the guns. Later Ricky and Clark retrieved the guns and hid them in the basement of their house. Paul Bivins died on February 28, 1974.

Several days later Ricky's father, Edward Puckett, arrived in Chicago to attend the victim's funeral. At that time Ricky informed his father about the shooting. After they reported the incident to the police, defendant was arrested.

Thereafter, the jury found defendant guilty of murder and conspiracy to commit murder. She was sentenced to a term of 30 to 90 years. Defendant appeals.

OPINION

I

Defendant first contends that she was denied due process of law in that the court failed to hold a competency hearing when there was a *bona fide* doubt as to her fitness to stand trial.

To require an accused to stand trial when he is unfit to do so

constitutes a denial of due process. (*Pate v. Robinson* (1966), 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836; *People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677.) A defendant is unfit to stand trial if, because of a mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. (Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—1(a); *People v. Murphy*.) Fitness speaks only to a person's ability to function within the context of trial; it does not refer to sanity or competence in other areas. A defendant can be fit for trial although his mind may be otherwise unsound. (*People v. Murphy*.) The mere fact that defendant suffers some mental disturbance or requires psychiatric treatment does not necessarily raise a *bona fide* doubt as to his ability to understand the nature and purpose of the proceedings against him or to assist in his defense. (*People v. Davis* (1978), 65 Ill. App. 3d 580, 382 N.E.2d 594; *People v. Richardson* (1978), 61 Ill. App. 3d 718, 377 N.E.2d 1235.) When a *bona fide* doubt as to defendant's fitness to stand trial is raised, the court shall order that a determination of that question be made before further proceedings. (Ill. Rev. Stat. 1977, ch. 38, par. 1005—2—1(c); *People v. Murphy*.) The critical inquiry is, did the facts presented raise a *bona fide* doubt that defendant possessed the two qualities necessary to make him fit for trial. (*People v. Murphy*; *People v. Dominique* (1980), 86 Ill. App. 3d 794, 408 N.E.2d 280.) The initial determination of whether a *bona fide* doubt has been raised is a decision resting within the discretion of the trial court since it is in a better position to observe and evaluate defendant's conduct. (*People v. Murphy*; *People v. Dominique*.) Accordingly, the trial court's decision will not be disturbed on review unless there is a clear showing of an abuse of discretion. *People v. Lewis* (1979), 75 Ill. App. 3d 560, 393 N.E.2d 1380; *People v. Dominique*.

Following opening statements, defense counsel informed the court that it had just come to his attention that the officers at the scene of the crime apparently found "commitment papers" on Paul Bivins' person. Defense counsel, without explaining the nature of these "commitment papers," argued that they brought defendant's mental stability into question and that it was incumbent upon the court to take certain action. During the ensuing discussion defense counsel admitted the existence of these papers had been entered in the police reports tendered by the State but that he did not notice it. At this point the court indicated that it had nothing to go on except "some nebulous story that says somewhere that somebody had some papers."

Defense counsel never asserted that defendant was unable to understand the charges or assist in her defense nor did he allege any facts that would indicate that she was presently unfit to stand trial. The mere fact that "commitment papers" were found on Paul Bivins' person in 1974 would not of itself be sufficient to raise a *bona fide* doubt as to

defendant's fitness to stand trial three years later. See *People v. Richardson* (1978), 61 Ill. App. 3d 718, 377 N.E.2d 1235; *People v. Richeson* (1962), 24 Ill. 2d 182, 181 N.E.2d 170.

Furthermore, defendant's conduct at trial belies any assertion that she did not understand the nature of proceedings against her or that she could not assist in her defense. She testified that she owned and operated a sewer business and that she had a nervous breakdown in 1974 after her mother's heart attack in January and her son's absence without leave from the Air Force. She admitted having a problem with alcohol but that she did not drink between 1972 and February 1974. After taking "Nyquil" for a cold in February of 1974, she was hospitalized for alcoholic gastritis. When she left the hospital on February 21, 1974, she was drinking heavily and taking two seconal capsules every four hours. Two weeks after Paul Bivins' death, she was hospitalized for another nervous breakdown. Soon after being released, she was taken to another hospital for overdosing her medication. She remained in that hospital for two weeks. The defendant has not been hospitalized since. Throughout her entire testimony, her responses were articulate, lucid and coherent and plainly indicated that she understood what she was being questioned about. Her cooperation with counsel is best demonstrated by her ability to remember, locate and bring into court the remaining seconal capsules which her son had given her a few days preceding Paul Bivins' death.

Finally, the "commitment papers" referred to by defense was actually a petition for hospitalization. In February of 1974, defendant had a recurrence of her problem with alcohol and was hospitalized with alcoholic gastritis. She left the hospital on February 21, 1974, without being released. She began drinking heavily and taking drugs. On February 22, 1974, Paul Bivins filed a petition to have her hospitalized, alleging that she refused to see a physician. This petition made no mention of any psychiatric problems or defects. Furthermore, this petition was never served and was dismissed on April 1, 1974. Consequently, these "papers" were not, as defendant now suggests, a legal commitment.

■■ In the instant case the court was not presented with any facts creating a *bona fide* doubt as to defendant's fitness to stand trial. Additionally, there is nothing in the record to indicate that defendant was not competent to stand trial; on the contrary, defendant's own testimony plainly demonstrates she was lucid and well aware of the nature of the proceedings against her. Consequently, we cannot say that the court abused its dicretion in denying a competency hearing.

## II

Defendant next contends she was denied a fair trial in that the State withheld material exculpatory evidence in failing to turn over the "commitment papers." She argues that these papers were material because they

could have been used to fashion a defense of insanity, either at the time of the offense or at the time of trial. The State maintains that it did not withhold any exculpatory evidence.

Suppression by the prosecution of evidence favorable to an accused, upon request, violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. (*Brady v. Maryland* (1963), 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196.) While the *Brady* rule generally involves the discovery, after trial, of information which was known to the prosecutor but unknown to the defense (*United States v. Agurs* (1976), 427 U.S. 97, 49 L. Ed. 2d 342, 96 S. Ct. 2392), the late disclosure of *Brady* material to the defendant in the midst of trial may also give rise to a violation of due process. (*In re Hatfield* (1979), 72 Ill. App. 3d 249, 390 N.E.2d 453.) Nevertheless, to establish a *Brady* violation, defendant must show: (1) that the evidence actually existed (*Hatfield; People v. Godbout* (1976), 42 Ill. App. 3d 1001, 356 N.E.2d 865); (2) that it was in the possession of the prosecutor (*Hatfield; People v. Gaitor* (1977), 49 Ill. App. 3d 449, 364 N.E.2d 484); (3) that the evidence was favorable to defendant (*Hatfield; People v. Middleton* (1976), 38 Ill. App. 3d 984, 350 N.E.2d 223); and (4) that the prosecutor failed to disclose this evidence in response to a "specific" request. *United States v. Agurs; Hatfield.*

■■ Defendant has failed to demonstrate that her due process rights were violated for several reasons. Following opening statements, defense counsel informed the court that it had just come to his attention that the officers at the scene of the crime apparently found "commitment papers" on Paul Bivins' person. While defense counsel initially argued that he never received this information from the State, he later admitted that this information was contained in the police reports which the State had tendered, but that he did not know about it. This information was also disclosed in a statement by Ricky Puckett to the State's Attorney which defendant obtained through discovery. The fact that defendant was able to use this information to obtain the original documents from the clerk of the circuit court amply demonstrates that the State adequately disclosed the existence of these legal papers to defendant.

Additionally, the State denied having possession of these papers and stated that, according to their information, the papers were given to defendant on the day of the shooting. One of the police officers who was present at the scene of the crime testified that he was at the hospital when a hospital security officer removed and inventoried Paul Bivins' personal effects. The officer further stated that he did not take possession of Mr. Bivins' personal effects nor did he have any control over them. Louis Wellington, the hospital's security officer, testified that he was present when Paul Bivins was brought to the hospital and that he inventoried Mr. Bivins' personal effects which included some legal papers. He further

testified that on the following morning he turned these papers over to the hospital cashier for safekeeping. Defendant offered no evidence to establish that the State had possession of the "commitment papers." Without such proof she fails to establish a *Brady* violation. See *In re Hatfield* (1979), 72 Ill. App. 3d 249, 390 N.E.2d 453; *People v. Hovanec* (1979), 76 Ill. App. 3d 401, 394 N.E.2d 1340.

Finally, defendant's late "discovery" of the existence of these commitment papers did not prevent her from presenting a defense based upon her condition at the time of the offense. At trial, defendant testified that she was drinking excessively and taking drugs during February of 1974. The "commitment papers" in no way explained or described her condition during this period but merely recited that she refused to see a physician. At best, the "commitment papers" merely corroborated her testimony. Since defendant did secure and use these documents during trial, the failure to secure this information prior to trial in no way created a reasonable doubt that did not otherwise exist. *United States v. Agurs* (1976), 427 U.S. 97, 112, 49 L. Ed. 2d 342, 354, 96 S. Ct. 2392, 2401.

Accordingly, we find defendant's contention that the State withheld material exculpatory evidence without merit.

### III

Defendant finally contends that she was denied her right to a speedy trial. She argues that she was entitled to discharge on three separate occasions, namely the periods of: (1) March 2, 1974, to August 9, 1974; (2) January 29, 1976, to June 29, 1976; and (3) August 20, 1976, to January 26, 1977.

Under the provisions of the applicable statute defendant, who had been released on bail, was entitled to a trial within 160 days of her demand for trial, unless she occasioned the delay. (*People v. Solheim* (1977), 54 Ill. App. 3d 379, 369 N.E.2d 308; Ill. Rev. Stat. 1973, ch. 38, par. 103—5(b).) For offenses allegedly committed prior to March 1, 1977, a delay occasioned by a defendant tolls the running of the statute, and a new statutory period commences to run from the date to which the case had been delayed. (*People v. Donalson* (1976), 64 Ill. 2d 536, 356 N.E.2d 776; *People v. Solheim.*) A defendant is considered to have occasioned a delay when he: (1) requests a continuance (*People v. Kuczynski* (1965), 33 Ill. 2d 412, 211 N.E.2d 687); (2) agrees to a continuance (*People v. Green* (1962), 23 Ill. 2d 584, 179 N.E.2d 644); or (3) when his actions otherwise cause or contribute to the delay. (*People v. Fosdick* (1967), 36 Ill. 2d 524, 224 N.E.2d 242; *People v. Bevis* (1980), 89 Ill. App. 3d 344, 411 N.E.2d 1123.) The number of days in any given time period for the purposes of the speedy trial act is computed by excluding the first day of the period and including the last. *People v. Solheim.*

■■ While defendant claims to be entitled to a discharge for the time periods March 2, 1974, to August 9, 1974, and January 29, 1976, to June 29, 1976, this issue was never raised in the trial court. The failure to apply for a discharge prior to conviction waives the right on appeal. (*People v. Kuczynski.*) Additionally, the failure to raise this issue in her post-trial motion, thus depriving the trial court of the opportunity to correct the alleged error, also constitutes a waiver. (*People v. Taylor* (1965), 32 Ill. 2d 165, 204 N.E.2d 734; *People v. Solheim.*) Nevertheless, defendant would not have been entitled to a discharge under either of these two periods.

■■ Initially, there are exactly 160 days between March 2, 1974, and August 9, 1974, and thus the span falls within the perimeters of the statute. Additionally, the memorandum of orders indicates that in July of 1974 defendant requested a continuance to August 6, 1974; and on August 6, she agreed to a continuance to September 12, 1974. Accordingly, the statute was tolled and new statutory periods began to run on two separate occasions during this period. Finally, since defendant was free on bail, the statutory period would not commence until she made a demand for trial. (Ill. Rev. Stat. 1973, ch. 38, par. 103—5(b); *People v. Kuczynski* (1965), 33 Ill. 2d 412, 211 N.E.2d 687.) There is no indication in the record that defendant made such a demand.

Similarly, the period of January 29, 1976, to June 29, 1976, contains only 152 days which is plainly insufficient to require a discharge. Again, there is no indication in the record that defendant demanded trial. Consequently, the statutory period was not activated.

■■ Since the issue of discharge for the period of August 20, 1976, to January 26, 1977, was raised in the trial court, the issue was preserved for review and will be so considered. This period contains only 159 days and is therefore insufficient to require a discharge where defendant was not in custody. Additionally, the memorandum of orders indicates that defendant on August 20, 1976, requested a continuance to September 2, 1976. As such, the statutory period was tolled and a new statutory period commenced on September 2, 1976. There are only 146 days between September 2, 1976, and January 26, 1977, which is equally insufficient to require a discharge. Accordingly, defendant was not entitled to discharge for this period.

For the reasons stated, the judgment of the trial court is affirmed.

Affirmed.

SULLIVAN, P. J., and WILSON, J., concur.