THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* WAYNE S. MIKEL, Defendant-Appellant.

Fourth District   No. 15108

Opinion filed June 18, 1979.

Dukes, O'Rourke, Stewart & Martin, Ltd., of Danville (John P. O'Rourke and Steven M. Helm, of counsel), for appellant.

Thomas J. Fahey, State's Attorney, of Danville (Marc D. Towler and Jane F. Bularzik, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. JUSTICE GREEN delivered the opinion of the court:

A multicount information was filed in the circuit court of Vermilion County, charging defendant Wayne S. Mikel and codefendant Charles W. Seaton with the murder of Anvil Nelson and the aggravated assault of Gary Patton and Tyrone Grant. The two defendants were tried separately. After trial by jury, defendant Mikel was convicted of murder and the two aggravated assaults and was sentenced to concurrent terms of imprisonment of 40 to 100 years for murder and 360 days for each aggravated assault. He appeals his conviction of the second aggravated battery charge and his murder conviction and sentence.

Defendant first contends that the evidence presented at trial was insufficient to prove his guilt of either the murder or second aggravated battery charges. We disagree.

At trial, several witnesses testified that sometime after 11 p.m. on November 19, 1977, a pickup truck containing two young white males stopped at the corner of Jackson and Van Buren near the Modest Tavern in Danville. Several of the witnesses identified a truck belonging to codefendant Seaton as being the same or similar to the pickup truck they saw on that night and two of the witnesses identified defendant as the passenger in the truck.

Several witnesses testified that the passenger in the truck exchanged racial insults with a group of black men and women standing near the corner. The passenger then fired a rifle out of the truck's window, narrowly missing one of the black men. This action was the basis for defendant's conviction for the aggravated assault of Gary Patton. On appeal, defendant does not contend that the evidence was insufficient to support this conviction.

Further evidence indicated that this truck then proceeded east on Van Buren and turned north on Washington Street. One or two minutes later, the witnesses heard more shots coming from that direction.

One witness testified that he passed the pickup truck on Van Buren, circled the block in his car to try to get behind the truck to get its license number, saw the same truck stopped at the intersection of Washington and North near the Corner Inn and heard what sounded like two shots. He then followed the truck for several blocks but stopped because he was afraid that the occupants would know he was following them.

Two witnesses who were in a parking lot across the street from the Corner Inn testified to hearing three shots and seeing a black man, who was walking near the Corner Inn, stagger after the second shot and fall

after the third shot. One of these witnesses saw a pickup truck at the intersection of Washington and North, about 5-7 feet from the man who was shot. He testified that the shots were coming from the side of the truck closest to the Corner Inn.

Both defendant and codefendant Seaton testified that they were in the area on the night of the murder about the time that the killing occurred and that defendant who was a passenger in Seaton's truck was shooting Seaton's rifle out the truck window. Both testified that they then left Danville and went to the Klondike Tavern in Westville. Defendant's sister-in-law at the time of trial testified that soon after defendant arrived at the Klondike, he told her that he had shot somebody.

A bullet was found by a police officer on the floor of the hospital morgue near the body of the deceased, during or shortly after the body was undressed. That bullet was identified as having been fired from the rifle used by the defendant on the night in question. Evidence also showed that the defendant and codefendant tried to destroy the codefendant's rifle by burning the stock and grinding the barrel and then throwing the barrel into a lake.

Defendant testified that after he and Seaton left a tavern on Main Street, they drove north on Washington and he fired the gun once or twice out of the window on the passenger side toward a parking lot. Both defendant and Seaton testified that they continued north on Washington and while the truck was stopped at the intersection of Washington and North, defendant fired the gun twice, shooting past Seaton out the window on the driver's side. Defendant testified that he was shooting at some trash cans in an alley and that as they pulled away, Seaton looked back and said that he saw a man walking down the sidewalk there. Defendant stated that at that time, he did not know he had shot someone.

Tyrone Grant, the victim of the second aggravated assault, testified that at about 11:45 p.m. on November 19 at the intersection of Main and Gilbert in Danville, a pickup truck pulled up behind his car on Gilbert (which was also Route 1), followed him for awhile, and then pulled up next to him at a stoplight. His description of the truck and the passenger were very similar to those given by witnesses to the earlier events, and several days later, he identified the truck owned by codefendant Seaton as the truck he saw that night. While they waited for the light to change, the passenger in the truck kept looking at Grant, and raised his right hand in a clenched fist and pointed down at Grant with his thumb. After the light changed the truck got in front of his car and when he tried to pass, it repeatedly cut him off. He then saw the window on the passenger side rolling down and saw the passenger pointing a gun out the window at him. He ducked and turned his car toward an exit. As he did so, he heard a sound like a firecracker. When he returned to Route 1, he saw the truck

three cars ahead of him. He did not try to pass the truck again but followed it to the stoplight in Westville where the truck turned off Route 1. After this incident, there was a hole completely through the door on the driver's side of his car, and the police officer to whom he reported the incident the following morning found a bullet inside the car between the door and the rear seat. Several days later, Mr. Grant viewed a photographic lineup and identified a picture of the truck's passenger. However, at trial, he was unable to identify the defendant as the person whose picture he selected.

■■ Defendant contends that where an eyewitness to a crime can remember many details of the incident but cannot identify the defendant as the guilty party, guilt has not been established beyond a reasonable doubt and a conviction must be reversed. Defendant cites no authority for this contention, and it is not a proper statement of the law. The failure of a victim to make an in-court identification does not preclude the defendant's conviction for that crime. Such an identification is not essential where other circumstances link the accused to the crime. In *People v. Mullen* (1976), 43 Ill. App. 3d 311, 356 N.E.2d 1337, this court affirmed a defendant's convictions for kidnapping and armed robbery, even though the armed robbery victim could not make a positive identification of the defendant. Other testimony by that victim linked the robber with the kidnapping and the defendant was positively identified at trial as the kidnapper.

■■ Likewise, in the instant case, Grant's description of the truck and its passenger was substantially similar to the descriptions given by other witnesses who had observed codefendant Seaton's truck and its passenger not more than 30 minutes earlier. Two of those witnesses positively identified defendant at trial as the truck's passenger and Grant identified Seaton's truck as the one involved in the incident. Defendant's testimony and that of Seaton placed them in the general area of the incident involving Grant at about the time of the occurrence. These circumstances link defendant to the aggravated assault on Grant. Thus, we do not consider the lack of identification by Grant at trial to require a reversal of defendant's conviction for this offense.

Defendant contends that evidence of his intoxication on the night of these offenses was sufficient to raise a reasonable doubt because it indicated he was unable to have the mental state necessary to commit these offenses. Voluntary intoxication may negate the mental state necessary for a conviction only where the intoxication is so extreme as to entirely suspend the power of reason; the accused must be incapable of acting knowingly or intentionally. *People v. Walcher* (1969), 42 Ill. 2d 159, 246 N.E.2d 256; *People v. Huggy* (1974), 19 Ill. App. 3d 247, 311 N.E.2d 355.

■ Defendant and other defense witnesses testified that defendant had been drinking and smoking marijuana on the night in question. One witness who saw defendant in a tavern at about 10 p.m. testified that defendant was so drunk he couldn't talk and witnesses who saw defendant between midnight and 2 a.m. described defendant as drunk and "pretty loaded." Other witnesses, however, stated that although defendant had been drinking, they noticed nothing unusual about him, his walk or his speech. One witness testified that after leaving the tavern in Westville, defendant drove himself and his fiancee to a friend's house. This witness, who was in another car, did not notice anything unusual about defendant's driving. This testimony plus the fact that defendant was able to recall and describe his actions on the night in question were sufficient to negate defendant's contention that his intoxication prevented him from forming the necessary intent.

We find the evidence sufficient to support the jury's conclusion that defendant's guilt of the murder and second aggravated assault was proved beyond a reasonable doubt.

Defendant, who was charged with all three offenses in one information, filed a pretrial motion objecting to the joinder and seeking severance. He alleged that he would be prejudiced in preparing for trial and during trial because the charges involved different alleged victims and locations, that the jury would believe that with three charges there must be something to at least some of the allegations, and that he might be deprived of favorable instructions because of the type of evidence admissible to prove one charge but not the other.

■■ ■ Two or more offenses may be charged as separate counts in the same information if the offenses are based on the same act or "2 or more acts which are part of the same comprehensive transaction" (Ill. Rev. Stat. 1977, ch. 38, par. 111—4). Charges may be severed for trial if it appears that a defendant or the State is prejudiced by such a joinder (Ill. Rev. Stat. 1977, ch. 38, par. 114—8). The law is clear that the decision on whether or not to sever is a matter within the discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. (*People v. Sockwell* (1977), 55 Ill. App. 3d 174, 371 N.E.2d 100.) Important factors to be considered in determining this question include the proximity of time and location of the various charges and the identity of evidence which would be presented to prove each charge. In the instant case, the first aggravated assault and the murder occurred just minutes and less than two city blocks apart. The time and distance between the murder and the second aggravated assault was several minutes and a few miles. The evidence is strong that the alleged actions were part of a shooting spree engaged in by defendant and Seaton. Those actions, thus, were part of the same general transaction or scheme and show a common motive, design and method of

operation. Substantially the same evidence could have been presented by the State at the trial of each offense. For these reasons, the denial of defendant's motion for severance was not an abuse of discretion.

■■ ■ Prior to trial, defendant moved to suppress a statement given by him to the police on November 23, 1977, alleging that the statement was involuntary because he did not understand his constitutional rights and did not voluntarily talk to police. The motion alleged, in part, that defendant had been asleep "in a drunken stupor" at 2:50 a.m. when police arrested him and that he was intoxicated and in a drugged condition during the interrogation. We believe that the evidence presented at the hearing on this motion was sufficient to prove by a preponderance of the evidence the voluntary nature of defendant's statement. The police officers involved testified that defendant was given his *Miranda* rights at three different times: in the car on the way to the police station, at the station before interrogation, and before defendant signed his statement which had been reduced to writing. They also testified that they noticed nothing unusual about defendant, his breath, eyes, speech, walk, or method of signing his name. In the statement, defendant was asked if he was under the influence of alcohol or drugs, and he answered no. After about two hours of interrogation, at defendant's request, he was permitted to see his girlfriend alone for 10-15 minutes. After she left, he agreed to give a statement. Although defendant testified that he did not remember being read his rights or signing his statement and that he did not recognize the interrogation form which contained a waiver of rights, he could remember other details of the interrogation. He also remembered the police showing him a paper and telling him to read it, that it was the statement of Charles Seaton (the codefendant) who had told them what the defendant did and that the defendant therefore had better talk to them. One of the officers, however, testified that the defendant was never shown a statement by the codefendant, that no such statement was ever in the room and that the defendant was never told that the codefendant had named him as the murderer. Even if the court believed the defendant's testimony with respect to the codefendant's statement, such action on the part of the police would not render defendant's statement inadmissible. The record on appeal shows that Seaton had given a statement to the police prior to the defendant's arrest, and the police properly could have informed defendant of this fact.

■■ On two separate occasions, the police showed photographs to an occurrence witness and to the victim of one of the alleged aggravated assaults. Both identified a photograph of defendant as the passenger in the truck on the night in question. At both times, defendant was in custody and was represented by counsel, but no attorney for defendant was present at either identification procedure. Defendant contends that the

use of a photographic identification procedure at a time when the defendant is in custody is impermissible per se, absent extenuating circumstances. This court addressed that issue in *People v. Meredith* (1976), 37 Ill. App. 3d 895, 899, 347 N.E.2d 55, 59, where defendant contended for the first time on appeal, that a photographic identification procedure was suggestive and improper because defendant was already in custody. This court stated:

> "Photographic identification procedures should not be employed when a defendant is in custody. [*People v. Holiday*, 47 Ill. 2d 300, 265 N.E.2d 634.] Defendant failed to object to the introduction of the testimony of the photographic identification on this basis. Apart from that procedural deficiency, however, defendant's custodial status is not the standard by which we must determine the propriety of the photographic identification. (*People v. Jackson*, 54 Ill. 2d 143, 295 N.E.2d 462.) The test remains, considering the totality of the circumstances, whether the identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *People v. Williams*, 60 Ill. 2d 1, 322 N.E.2d 819."

In the instant case, defendant does not contend that the photographic procedure used was suggestive. Indeed, the uncontradicted testimony of the officer who conducted both identification procedures (the sole witness at the hearing on defendant's motion to suppress) clearly supports the trial court's finding that no suggestiveness or improprieties were shown to have occurred in the photographic identification procedures used here. Accordingly, the trial court did not err in denying defendant's motion to suppress.

Before trial resumed on the fourth day, defense counsel moved for a mistrial based on certain events of the previous day. He stated that during an afternoon break, the son of the murder victim made several remarks to him which he felt were intended to intimidate him in his presentation of the case, and after trial, as he and another defense attorney were driving home, the son of the deceased appeared to be following them all the way to their home town. The trial court indicated that it considered this a serious matter and that it would do anything within its power to protect defense counsel, but denied the motion for mistrial. No further complaints were made on this ground during the remainder of the trial.

Defendant contends that these threats to defense counsel effectively denied defendant the right to effective assistance of counsel, and therefore he should be awarded a new trial. Defendant does not contend that the representation provided by defense counsel was less than competent, and in fact, in his brief, defendant states that the attempted coercion apparently had no obvious effect and that defense counsel was

able to make appropriate objections and preserve many points for appeal. Defendant cites no cases in which threats against defense counsel or a prosecutor, per se, have been found to require a mistrial. We conclude that where the record shows a vigorous and effective representation of defendant by counsel, conduct toward that counsel which may be interpreted as threatening is not sufficient proof in itself that defendant has been deprived of his right to effective assistance of counsel.

Defendant next contends that he was denied due process and the right to a fair trial because he was not permitted to introduce into evidence testimony that Anvil Nelson was carrying an unexplained and unusually large sum of currency upon his person at the time of his death and other evidence which defendant contends indicated that another person may have been involved in the incident surrounding Nelson's death. In an offer of proof on behalf of defendant, one of the police officers testified that he found a little over $3000 in a wallet in Nelson's trousers. It did not appear to have been disturbed. In an offer of proof on behalf of defendant, a barmaid at the Corner Inn testified that at about 12:45 a.m. on the night Nelson was shot, she saw someone go into the restroom and she subsequently found a very dirty T-shirt with blood on it in a trash can in there. She did not know who that person was. Both offers of proof were denied by the trial court.

■■ Although a defendant is entitled to all reasonable opportunities to present evidence which might tend to create doubt as to his guilt, the evidence offered must be relevant and material in order to be admissible. It is within the discretion of a trial court to exclude evidence offered by the defense in a criminal case without infringing on the accused's constitutional right to present a defense when the relevancy of the evidence is so speculative as to give the evidence little probative value. (*People v. Gischer* (1977), 51 Ill. App. 3d 847, 366 N.E.2d 521.) We believe that the probative value of the testimony presented in these two offers of proof was too speculative to require its admission into evidence. The trial court did not err in denying these two offers of proof.

■■ Defendant contends that in cross-examination of him, the prosecutor improperly asked him to comment on the credibility of prosecution witnesses. He argues that this was unduly prejudicial and that his motion for mistrial made at this point should have been granted. During cross-examination of the defendant, the prosecutor asked him, in several different ways, if on the night in question defendant had fired a shot out the truck window at Van Buren and Jackson near the Modest Tavern, and defendant responded that he didn't know, he didn't believe so and he couldn't say for positive. The prosecutor then asked him:

"Q. Do you recall about three days ago when Selena Young and

Robert Patton indicated that you were the person who fired a gun out the window of the Modest Tavern that night?

A. That's what they said.

Q. They were incorrect, weren't they?

A. I believe so."

Defense counsel objected to this last question and, out of the presence of the jury, moved for a mistrial. While it is not proper for a prosecutor to ask a defendant whether State witnesses were "lying," such questions are not necessarily prejudicial and have been held to be harmless error. (*People v. Addison* (1977), 56 Ill. App. 3d 92, 371 N.E.2d 1025). In the instant case, this single question asking only whether the other witnesses were "incorrect" cannot be viewed as constituting a material factor in the defendant's conviction.

With respect to the charge of murder, defendant tendered instructions in the form of Illinois Pattern Jury Instructions, Criminal, Nos. 11.13 and 11.14 (1968), defining reckless conduct and stating the propositions which must be proved in order to sustain such a charge. Both instructions were refused. Defendant contends that there was sufficient evidence in the record that his actions were reckless, and thus the trial court was required to give the tendered instructions on reckless conduct.

A similar question was raised in *People v. Johnson* (1975), 32 Ill. App. 3d 36, 335 N.E.2d 144, where the defendant was charged with a shotgun murder. The trial court refused defendant's tendered instruction on reckless conduct but agreed to give an involuntary manslaughter instruction if tendered by defendant. On appeal, defendant argued that reckless conduct was an included offense to murder, voluntary manslaughter, or involuntary manslaughter and thus the court erred in refusing the tendered instruction. The court on appeal rejected this argument, ruling:

"The offense of involuntary manslaughter concerns the death of an individual while reckless conduct deals with the infliction of bodily harm. The evidence in this case establishes that the decedent was killed. There was no evidence that the defendant only inflicted bodily harm. Consequently, it cannot be successfully contended that the result of all the evidence constitutes proof of guilt of reckless conduct as distinguished from involuntary or voluntary manslaughter. The trial court, therefore, did not err in refusing to instruct the jury on reckless conduct." (32 Ill. App. 3d 36, 48, 335 N.E.2d 144, 154-55.)

Likewise in the instant case, the victim was killed and there was no evidence that the defendant inflicted only bodily harm. Instructions on involuntary manslaughter were tendered by defendant and given by the court.

■■ We find no error in the trial court's refusal to instruct on reckless conduct in the instant case.

Finally, defendant contends that his sentence of 40 to 100 years for the offense of murder was excessive in view of his age and background and the gross disparity between his sentence and that of his codefendant Seaton. Defendant was 22 years of age at the time of sentencing and had no prior history of violent crime against persons. His codefendant was sentenced to 15 to 35 years on his conviction for the same offense.

■■ ■ Fundamental fairness requires that similarly situated defendants not receive grossly disparate sentences. However, disparity in sentencing is proper for defendants who differ in their criminal backgrounds and in their role or participation in an offense. The presentence report prepared on codefendant Seaton was not part of the record in this appeal; however, it is clear from the evidence presented at trial that defendant's participation in this offense was much more serious than Seaton's conduct. Although Seaton drove the truck on the night in question and it was his gun which was the murder weapon, defendant was the one who fired the shots which killed Anvil Nelson. There was no provocation on the part of the victim, and in fact, defendant's actions appear to have been part of a shooting spree.

Defendant's presentence report shows several convictions for minor criminal offenses and one conviction of burglary for which he was sentenced to a term of 3 years' probation. At the time of the instant offenses, defendant had completed one year of that probation. The report shows that defendant has held several short term jobs, and with the exception of one employer who spoke very highly of defendant at the sentencing hearing, his employment record is rather poor. Defendant admitted to having a serious problem with the abuse of alcohol. Although he was ordered to seek treatment for this problem as a condition of his probation, he had not done so. Under these circumstances we do not consider defendant's sentence to be excessive.

For the reasons stated above, defendant's convictions and sentences are affirmed.

Affirmed.

MILLS and TRAPP, JJ., concur.