THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RONALD HUNT, Defendant-Appellant.

Third District    No. 80-580

Opinion filed September 9, 1981.

Robert Agostinelli and Thomas Lilien, both of State Appellate Defender's Office, of Ottawa, for appellant.

Bruce W. Black, State's Attorney, of Pekin (John X. Breslin and Rita F. Kennedy, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE BARRY delivered the opinion of the court:

Following a jury trial in the circuit court of Tazewell County, the defendant, Ronald L. Hunt, was convicted of armed robbery (Ill. Rev. Stat. 1979, ch. 38, par. 18—2(a)). He was subsequently sentenced to the Department of Corrections for a term of 30 years. On appeal, he raises four issues for our consideration: First, did the State fail to prove the defendant guilty beyond a reasonable doubt; second, did the trial court commit reversible error when it refused to allow into evidence the

allegedly exculpatory fact that defendant's fingerprints were not on a bag of marijuana seeds found on a driveway where the alleged getaway car backed up subsequent to the robbery; third, did the trial court err in refusing to give defense instruction IPI Criminal No. 3.14 (modified); and finally, did the trial court err in allowing an expert to testify regarding the comparison of two items of physical evidence.

We affirm.

Our disposition of this case requires a somewhat detailed recitation of the evidence adduced at defendant's trial. Seven eyewitnesses to the armed robbery, none of whom made an in-court identification of the defendant, testified for the prosecution. The first to testify was Delbert Callaway, the bartender at Ole' Dad's Place, 1010 South Second Street, Pekin. He stated that between 10:30 and 11 p.m., on June 13, 1980, he saw someone enter the tavern by the back door. Once inside, this person displayed a .12-gauge pump shotgun, which he banged on the bar. He then ordered everyone in the tavern to place their wallets on the bar and to get on the floor. At gunpoint, the robber directed Callaway to put the money from the cash register into a sack. After Callaway did so, he, too, got on the floor, and the robber left. Callaway described the robber as weighing between 145-160 lbs., and as having a stocky, muscular build. (The defendant presented evidence that his weight on June 14 was 120 lbs.) At the time of the offense the robber was wearing bib overalls, and was masked with a stocking. At a police lineup held June 16, 1980, Callaway was unable to identify any of the participants as the robber, although he had previously asserted that he would be able to identify the robber's voice.

The next witness for the prosecution was Donald Beeney, a tavern patron. He had been drinking for three hours before the robbery occurred, and admitted that by 10 p.m. his ability to observe had been affected by his consumption of alcohol. He testified that he first observed the robber from a distance of about 20 feet. Immediately after the robber ordered the people in the tavern to get on the floor, Beeney ran out of the building and made a futile attempt to locate a police car. He estimated that he was in the tavern with the robber for no longer than a minute. After failing to find a police car, Beeney went around a corner toward a side street where his own car was parked. At this time he saw the robber running in a southerly direction in the alley behind the tavern. As the robber ran into the next block Beeney apparently lost sight of him. He then heard a car "take-off."

Beeney described the robber as wearing overalls and a stocking hat over long, light colored hair. Shortly after the robbery, he told another tavern patron that the robber resembled Robert Hilst, an acquaintance of Beeney's. The defendant, however, did not resemble Hilst. At the June 16

lineup, however, Beeney identified the defendant, who was number three, with the notation "3?".

Oscar Mullinax was next to testify. He admitted that his recollection of the robbery was dim because he suffered a blackout during the course of the crime. The only thing he could remember was seeing a masked individual, whom he described as slightly taller and bigger than himself, leave the tavern by the back door. Mullinax is 5'7" tall.

Lloyd Earhart and his wife, Geneva, were the next tavern patrons to testify for the State. Their description of the robbery itself was similar to that given by Callaway. They both described the robber as between 5'8" and 5'10" tall, and stockily built. According to the Earharts, the robber was clad in bib overalls when the crime was committed. Although Geneva Earhart viewed the June 16 lineup, she was unable to identify the perpetrator. Lloyd Earhart did not view the lineup.

Mildred Hedge testified that the night of the robbery she was in Ole' Dad's Place with her husband who had been recently hospitalized for a back problem. After the masked robber entered and ordered everyone to get on the floor, she stood between her husband and the robber and told the robber that her husband was unable to get on the floor. The robber, addressing Hedge as "Ma'am," again told her to get on the floor. At this time she did as he told her. Hedge described the robber as 5'8" tall and slightly built, wearing olive green fatigue pants and a longsleeved green shirt. At the June 16 lineup, which Ms. Hedge attended, the participants were instructed to say "Ma'am, get on the floor." Ms. Hedge, who had previously informed the police that she would be able to recognize the robber if he said "Ma'am," wrote "2?" on her card. Later that same day, however, Hedge decided that it was really number three that was the robber, and so informed the police.

The final eyewitness to the crime was Dave Wagner. He testified that he was no more than five feet away from the robber when he was told to lie down. After the robber departed, Wagner ran out of the front door and down Second Street in an attempt to obtain a license number. He went for two blocks, but saw no cars. Wagner then returned to the tavern by way of Dell Street, passing by the home of Benny Hale at 1902 Dell. Wagner testified that he saw no cars in Hale's driveway, and did not enter the driveway at any time. There was some evidence, however, that Wagner was seen getting out of a car parked momentarily on Hale's driveway the night of the robbery, and that he had in fact walked across the driveway. Upon returning to the tavern, Wagner was questioned briefly, and then left.

Wagner described the robber as weighing between 160-165 pounds and having moderately long hair. He was unable to describe the robber's clothing. Wagner testified that he initially thought the robber was a South

Pekin gas station attendant whom the defendant did not resemble. At the June 16 lineup Wagner, however, positively and unequivocally identified number three, the defendant, as the robber.

The testimony of the next four State's witnesses concerned the appearance of the alleged getaway car in Benny Hale's driveway the night of the robbery. Sue Thompson and Eileen Holman testified that the night of the robbery they were sitting in front of Holman's home at 1200 Dell. (Dell Street runs parallel to Second Street. The alley behind Ole' Dad's Place is parallel to and between both of these streets. Eads Street is a cross street between Dell and Second.) At approximately 11 p.m., Thompson and Holman observed a car with no lights on exit the alley behind the tavern, cross Eads, and enter the alley on the other side of the street. Both testified that this car was loud, and Holman further stated that the car sounded as though it was dragging a tail pipe. A short time later this same car reappeared. According to Holman and Thompson, the car parked momentarily on Benny Hale's driveway, backed up onto Dell, and then drove away. Thompson testified that the car, which she described as a large, light-over-dark-brown four-door, was dragging a muffler and had a broken tail light. Holman also stated that the right tail light was broken.

Kelly Pritchard and John Wyman testified that at approximately 11 p.m. on June 13, they were sitting in a pickup truck parked in front of 1202 Dell and observed a car with a loud muffler drive north on Dell into Hale's driveway. After about one minute, the car backed up out of Hale's driveway and drove away. Wyman testified he saw someone get out of the car when it was stopped on Hale's driveway, and thought this person might have been Dave Wagner. Pritchard stated at the trial he did not see anyone get out of the car, although he admitted that he had previously told defense counsel he saw Dave Wagner get out of the car and stand on the driveway. Pritchard described the car that stopped on Hale's driveway as dark in color. Wyman described the car as being large and either bronze or brown colored. He also testified that the right tail light was broken.

Other relevant testimony was given by Pekin police officer James Conover, Pekin police investigator Craig Salmon, and Joseph Bubonic, a forensic scientist and lab supervisor at the Bureau of Scientific Services. Conover testified that in response to a police dispatch he met Officer Salmon at 1909 Dell between 11:30 and 12 a.m. On Hale's driveway he observed a small plastic bag containing what appeared to be marijuana seeds. Fingerprints were found on the bag, but did not belong to the defendant.

Shortly afterwards, Conover went to the alley behind Ole' Dad's Place. There he discovered tire tracks and a pile of garbage that appeared

to have been run over by a car. A short distance away from the refuse, Conover found a section of automobile tailpipe. After spending 15 minutes in the area, Conover left to search for an automobile fitting the description provided by eyewitnesses. At approximately 12:45 a.m., Conover observed a beige-over-brown four-door Pontiac Catalina parked in front of the residence of the defendant's sister in Shaeferville. Conover also saw that the Pontiac's tailpipe was on the ground and hanging off the car. The defendant was not at his sister's house when the police arrived, but came shortly thereafter. His car was impounded after his arrival. Conover stated that at no time did he observe anything unusual about the Pontiac's tail lights. When the car was examined at the Pekin police garage the next day, it was discovered that the right tail light did not work.

Officer Salmon's testimony regarding the police activity immediately after the crime was substantially similar to Conover's. He testified that in addition to the piece of tailpipe found in the alley near the tavern, a muffler and a bracket with a broken piece of rubber attached were also found nearby. Officer Salmon further testified that when the defendant was confronted with the evidence against him the following day, he denied involvement in the offense, and stated that at the time the crime was committed he and Steve Seward were at some Peoria taverns. Seward testified for the State, however, and refuted defendant's alibi, stating that he was in Bonner, Illinois, from 9:30 until approximately 1 a.m. the night of the offense, and was not at that time in the company of the defendant.

Forensic scientist Bubonic, over defense objection, fit the piece of rubber remaining on the bracket found near the crime scene with a piece of rubber discovered on the remnants of the Pontiac's exhaust system after it was impounded, and concluded that these pieces were at one time joined. The State concluded its case against the defendant with evidence that the Pontiac Catalina was sold to the defendant on May 22, 1980.

■■ The first issue raised on appeal by defendant Hunt is whether the evidence introduced by the State which we have detailed above failed to prove him guilty of the crime of armed robbery beyond a reasonable doubt. As the defendant points out in his appellate brief, the evidence against him falls into three categories: Eyewitness testimony; circumstantial evidence that his Pontiac was the getaway car; and testimony contradicting his alibi defense. As to the eyewitness identification of the defendant, the law is well-settled. "[A] conviction cannot be deemed to be sustained by evidence beyond a reasonable doubt if the identification of the accused was vague, doubtful and uncertain." (*People v. Cullotta* (1965), 32 Ill. 2d 502, 504, 207 N.E.2d 444, 446; *People v. White* (1978), 56 Ill. App. 3d 757, 372 N.E.2d 691.) However, one positive identification is sufficient to convict (see *People v. Vriner* (1978), 74 Ill. 2d 329, 385

N.E.2d 671). In the instant case, eyewitness testimony was presented by seven individuals. None of the eyewitnesses made an in-court identification of the defendant, but in light of the fact the robber was masked at the time of the crime, the absence of any in-court identification is not unusual nor unexpected. Of the three eyewitnesses who were able to make an out-of-court identification at the June 16 lineup, only one, Dave Wagner then positively and unequivocally identified the defendant as the robber.

Even if Wagner's identification of the defendant was insufficient, standing alone, to support a conviction, when it is considered together with the other evidence of defendant's guilt the jury verdict is amply supported. It is a fair and reasonable inference from the circumstantial evidence presented that defendant's car was used in the crime. Eyewitness Beeney testified that shortly after he lost sight of the escaping robber he heard a car drive off to the south in the alley behind the tavern. Witnesses Thompson and Holman testified that about 11 the night of the offense they observed a car leave the alley behind the tavern, park momentarily in a driveway at 1902 Dell, and then depart. Witnesses Wyman and Pritchard also saw a car on Dell Street back up onto Benny Hale's driveway at 1209 Dell shortly after the crime. They also testified that this car was loud, and Holman testified that the muffler was dragging. The car was described as large and bronze or brown colored. Thompson described the car as a light-brown-over-dark-brown four-door. Thompson, Holman and Pritchard all stated that the car's right tail light appeared to be broken. When the Pekin police searched the alley after the robbery, they found a tailpipe, muffler and bracket. A piece of rubber attached to this bracket matched a piece of rubber remaining on the undercarriage of defendant's car, a 1974 beige-over-brown Pontiac Catalina four-door which, when found, was missing a large portion of its exhaust system. The right tail light of this car was found to be inoperable. As previously stated, it is a legitimate and reasonable inference from this evidence that the defendant's car was used in the robbery, a fact which tends to establish the defendant's complicity.

Also tending to establish the defendant's involvement in the crime is defendant's post-arrest alibi. Defendant Hunt stated that at the time of the offense he was with Steve Seward in Peoria. Seward, however, refuted defendant's alibi. "A defendant's false exculpatory statement has independent probative value as evidence of consciousness of guilt * * *." *People v. Mitchell* (1975), 35 Ill. App. 3d 151, 162, 341 N.E.2d 153, 162.

■■ In short, regarding defendant's contention that the State failed to meet its burden of proof, when the eyewitness testimony, which included one positive and unequivocal identification, is considered in conjunction with the testimony placing the defendant's car in the vicinity of the crime a short time after its commission and with defendant's refuted alibi, it

becomes evident that the jury's verdict of guilty is amply supported. The evidence clearly established Hunt's guilt beyond a reasonable doubt.

■■ ■ As his second issue, the defendant contends that the trial court committed reversible error when it refused to allow into evidence the fact that his fingerprints were not on the bag of marijuana seeds found on Benny Hale's driveway by the Pekin police. The defendant sought to introduce the evidence of the lack of his fingerprints on the bag to refute the State's evidence that his car momentarily stopped on Hale's driveway at 1209 Dell after the armed robbery. We are of the opinion, however, that the trial court properly excluded this evidence. "Although a defendant is entitled to all reasonable opportunities to present evidence which might tend to create doubt as to his guilt, the evidence offered must be relevant and material in order to be admissible. It is within the discretion of the trial court to exclude evidence offered by the defense in a criminal case without infringing on the accused's constitutional right to present a defense when the relevancy of the evidence is so speculative as to give the evidence little probative value." (*People v. Mikel* (1979), 73 Ill. App. 3d 21, 30, 391 N.E.2d 550, 557.) Here, the relevancy of the absence of defendant's fingerprints on the bag is much too speculative. Before the grand jury of Tazewell County, Benny Hale's wife testified that she and her husband left their house between 5:30 and 6 the evening of the crime. The bag was not seen before that time. The armed robbery occurred at 10:30 or 11 p.m., and the bag was not found by the Pekin police until 1½ hours later. In this seven-hour period, anyone could have placed the bag of marijuana seeds on Hale's driveway. Although the appearance of defendant's fingerprints on the bag would have tended to establish the presence of the defendant in the vicinity between 5:30 and 12:30 a.m., the lack of his fingerprints on the bag does not tend to establish his absence from the area during the same period of time. Given the *de minimis* probative value of this evidence, the trial court did not abuse its discretion in excluding it.

Defendant next contends that the trial court erred in not giving his instruction No. 4, a modified version of Illinois Pattern Jury Instruction, Criminal, No. 3.17 (1968) (hereinafter IPI Criminal). Defendant's instruction No. 4 was as follows:

> "Evidence has been received that a prosecution witness may have been involved in the commission of the crime for which the defendant is charged. The testimony of such a witness is subject to suspicion, and should be considered by you with caution. It should be carefully examined in light of the other evidence in the case."

The prosecution witness alluded to in the instruction was Dave Wagner, who, on the basis of Pritchard and Wyman's testimony that he might have been seen leaving the getaway car when it was parked on

Hale's driveway, was at one time a suspect in the investigation. Wagner was never charged with the offense.

■■ ■ We believe the defendant's instruction was properly refused. By tendering this instruction, the defense was attempting to equate the testimony of a former suspect with the testimony of an acknowledged criminal accomplice whose testimony rightfully is to be viewed by the trier of fact with caution and circumspection. (*People v. Baer* (1976), 35 Ill. App. 3d 391, 342 N.E.2d 177.) If defendant's instruction were to be allowed, the testimony of one who was at one time a mere suspect is to be viewed in the same light as that given by an accomplice who "testifies that he was involved in the commission of a crime with the defendant." (IPI Criminal No. 3.17.) However, the mere fact that a witness was at one time a suspect in a criminal investigation does not mean that his testimony should necessarily be examined with a jaundiced eye. It may be indicative of nothing more than his presence in the wrong place at the wrong time. In short, there is no valid justification for viewing the testimony of a one-time suspect who is never charged with an offense with the same suspicion given the testimony of an admitted criminal accomplice.

Finally, the defendant contends that the trial court erred in allowing expert witness Bubonic to testify regarding his comparison of the piece of rubber attached to the muffler bracket found in the vicinity of the tavern and a piece of rubber remaining on what was left of the exhaust system of Hunt's Pontiac. At defendant's trial, Bubonic testified that in the course of his analysis of the two rubber items (People's exhibit Nos. 8(C) and 8(D)) he attempted to piece the items together "to see if they could have been at one time one * * *." The assistant State's attorney then asked Bubonic to fit the two pieces together for the benefit of the jury. At this point defense counsel objected on the grounds that the jury could just as easily make a physical comparison of the pieces. The objection was overruled, and Bubonic proceeded to fit the pieces together. As he did so, he stated "[e]ssentially what I did do was to piece these together as one would put a puzzle together, looking for the areas that had common similarities first of all so that I just didn't fumble around and it was just a simple overlaying of the one item on the other which in this particular case anyone would be able to do as the defense attorney has suggested." Again, defendant's objection to the comparison of the pieces of rubber as not being a proper subject for expert testimony was overruled. Bubonic ultimately stated that in his opinion the two rubber pieces were joined at one time.

■■ ■ Defendant argues that because, as Bubonic himself admitted, anyone could have fit the two items of physical evidence together, it was error to have an expert testify on this very subject. "[I]f the subject is not one requiring peculiar skill and knowledge but is within the range of ordinary intelligence and observation, opinion evidence is not admissible."

(*People v. Morretti* (1955), 6 Ill. 2d 494, 530, 129 N.E.2d 709, 728, *cert. denied* (1958), 356 U.S. 947, 2 L. Ed. 2d 822, 78 S. Ct. 794.) However, any error that might have been caused by Bubonic's fitting of the two rubber pieces must be considered harmless. As the State points out in its brief, if Bubonic was correct in observing that anyone could have matched the two exhibits, then the members of the jury would have been able to do no more than accomplish on their own what Bubonic demonstrated. More importantly, the crucial aspect of Bubonic's testimony is in his conclusion that the two pieces were once joined, not in his physical matching of the two items. We believe that such a conclusion is beyond the ken of the ordinary layman, and a proper subject for expert testimony.

For the foregoing reasons, we affirm the judgment of the circuit court of Tazewell County.

Affirmed.

HEIPLE, J., concurs.

Mr. JUSTICE STOUDER, specially concurring:

Although I am not wholly in accord with the reasoning of the majority, I am in agreement with the result reached and join in affirming the defendant's conviction.

My only area of disagreement relates to the expert witness and his opinion that the two parts were at one time joined together. From the expert's own previous testimony, his opinion was not based on any peculiar or particular skill not possessed by the general public. The only basis for his opinion was his observations that the two parts fit together, an inference which was the result of common observation, not expert knowledge or skill. I don't think the testimony met the tests usually employed to determine the appropriateness of expert testimony, and indeed the majority has not cited any precedent involving any similar factual testimony.

However, I think the error was harmless beyond a reasonable doubt, both because the facts and opinion were ones readily based on common observations, and, further, no particular issue or dispute centered upon these facts.