THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. BILLY STEVENS, a/k/a Billy Jo Stevens, Defendant-Appellant.

Fourth District No. 4—88—0681

Opinion filed September 28, 1989.

866

Thomas M. Goodwin and Mark S. Goodwin, both of Dougherty, Hofmann & Goodwin, of Danville, for appellant.

Craig H. DeArmond, State's Attorney, of Danville (Kenneth R. Boyle, Robert J. Biderman, and Gwendolyn W. Klingler, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE KNECHT delivered the opinion of the court:

Defendant was charged by information with 11 counts arising out of a residential burglary in Vermilion County that involved theft and sexual assault of a 64-year-old woman, and a later break-in at a nearby residence. A jury convicted defendant of aggravated criminal sexual assault, criminal sexual assault, residential burglary, theft (over $300), criminal damage to property, and trespass to residence. We affirm.

Defendant Billy J. Stevens was charged by information with two counts of residential burglary (Ill. Rev. Stat. 1987, ch. 38, par. 19—3)

(counts I and II), two counts of aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(a)(5)) (counts III and IV), two counts of criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(1)) (counts V and VI), one count of theft (over $300) (Ill. Rev. Stat. 1987, ch. 38, par. 16—1(a)(1)) (count VII), two counts of criminal damage to property (Ill. Rev. Stat. 1987, ch. 38, par. 21—1(a)) (counts VIII and IX), and two counts of trespass to residence (Ill. Rev. Stat. 1987, ch. 38, par. 19—4) (counts X and XI). Counts I through VIII arose out of an incident that occurred on or about January 23, 1988, at the dwelling place of D.W., located on King Street in Tilton, Illinois. The sexual assault counts pertained to the alleged acts of vaginal and oral intercourse defendant forced on 64-year-old D.W. The theft count and one count of criminal damage to property also related to the D.W. break-in. Counts IX through XI pertained to the unauthorized entry by defendant the same night into the residence of another woman, H.F., located within several blocks of King Street.

Defendant filed a pretrial petition for examination by an expert to determine his fitness to stand trial. The trial court questioned defendant at the hearing on the motion and as a result determined there was no *bona fide* question as to his fitness for purposes of trial. The court concluded defendant understood the charges against him, the nature of the proceedings, and was able to assist in the preparation of his defense. The motion for expert examination was denied.

Also prior to trial, defendant made a motion to suppress a tape-recorded statement made to law enforcement officials after his arrest. The statement contained a full confession by defendant of the offenses charged. The following evidence was heard at the hearing on the motion.

The State called Investigator John Howard, who testified that on January 25, 1988, he took a tape-recorded statement from defendant while he was in custody in connection with a complaint made by D.W. The officer indicated prior to taking the statement he advised defendant of his *Miranda* rights. A carbon copy of the warning and rights waiver form signed by defendant was admitted into evidence. Officer Howard and Investigator Miller were present when defendant read the *Miranda* warning out loud and initialed the end of each paragraph. Defendant indicated he understood his rights, had no questions, and agreed to sign the waiver form and talk to the officers. Both officers also signed the form. According to Howard, defendant was slow in reading the rights form, but was able to read it back to the officers without difficulty. Defendant did not ask Howard to explain or repeat anything.

In addition, Howard advised defendant of the crime the police were investigating and what evidence they were seeking. Howard denied he threatened defendant or promised him leniency in the course of the interview. Defendant did not seem confused or under the influence of drugs or alcohol. Howard opined defendant gave his statement voluntarily.

On cross-examination, Howard testified defendant was arrested on January 23, 1988, and had been in custody around 30 hours when he gave the tape-recorded statement. Howard knew defendant had only a tenth-grade education and noticed he appeared upset at different times during the interview. On redirect, Howard denied defendant was upset at the time he read and signed the rights waiver form.

At the hearing on the motion to suppress, defendant testified he did not understand his rights when he waived them. He said he was frightened and upset at the time and gave the statement to the investigators because they pressured him and told him "nothing bad would happen." On cross-examination, defendant denied the officers gave him an opportunity to ask questions, but admitted they asked him if he understood his rights and he answered in the affirmative.

In rebuttal, the State called Investigator Gary Miller, who testified he was present when defendant gave his recorded statement. Defendant indicated he understood his constitutional rights and did not have any questions. Miller remembered defendant did not read the waiver form quickly and was upset at the time. However, the officer did not consider defendant's emotional condition unusual under the circumstances.

Defense counsel argued for suppression of the statement due to defendant's lack of education, his emotional state, and because the statement was nothing more "than a product of his mistaken desire to please or desire to placate his captors." Counsel also suggested the statement was not given voluntarily. The State argued defendant's statement was knowingly, voluntarily, and intelligently given. The *Miranda* rules were followed, defendant had no questions and did not claim the officers put words in his mouth. Moreover, defendant was not unfamiliar with the criminal justice system. The court agreed and denied the motion.

The court also heard defendant's pretrial motion to sever the charges relating to the D.W. break-in from those alleged to have been committed at the H.F. residence. Defendant argued the D.W. and H.F. residences are approximately one mile apart and the offenses committed at each address were separate, independent, and dissimilar. Defendant suggested his case, as it pertained to the D.W. break-in,

might be prejudiced by the strong evidence the State had against him relating to the H.F. break-in. The State argued both offenses involved residential break-ins which occurred on the same evening and within blocks of each other. The court denied the motion and held as follows: "The closeness of proximity of place, time and similarity of circumstances all lead me to the conclusion that this was one transaction."

At the trial on May 17, 1988, D.W.'s daughter, L.W., testified that on January 23, 1988, she lived with her mother, D.W., and her father on King Street in Tilton. L.W. left the house at about 8 p.m. that night after checking the back door and locking the front door. At that time the house was neat and clean and her mother was in bed. L.W. said she came home around 2 a.m. January 24, 1988, and found one of the front door window panes had been broken and the house had been ransacked. L.W. found her mother huddled on the floor in the corner of the spare bedroom. She appeared as if she were in shock and she had scratches on her face. D.W. immediately told her daughter: "I have been raped." D.W. took a bath before L.W. took her to the hospital.

D.W. testified she took a prescription sleeping pill at 7 p.m. on January 23, 1988. Around 7:30 p.m. she took an additional pill and fell asleep thereafter. D.W. woke up screaming when she felt someone grab her in the chest area. After dozing off again, she awoke to find her nightgown and panties were torn. The clothing was not torn when she went to bed. D.W. remembered taking a bath before going to the hospital, but, due to her dazed condition, did not recall coming home. On cross-examination, D.W. admitted she told the examining physician at the hospital she did not remember any sexual penetration or sexual contact that evening.

D.W.'s husband, O.W., testified he came home around 2 a.m. on January 24, 1988, and found his house had been robbed and ransacked. O.W. said one windowpane was broken out of the front door. The television was moved from the bedroom to the front porch along with a china clock, and a jewelry box was sitting on the davenport. The VCR wires had been cut and the VCR, valued at $389, was missing. A checkbook and some cash had also been removed. Later that day, O.W. found his VCR and transistor radio lying in the bushes in his yard. O.W. testified his wife is 64 years old and was born December 18, 1923.

H.F. testified that on January 23, 1988, she lived on South Central Street in Tilton. Around 10 p.m. that evening she heard the sound of glass breaking in her basement. H.F. dialed 911 and remained on the phone until the police arrived. Meanwhile, the intruder,

later identified as defendant, came upstairs and sat down at her kitchen table. Defendant was mumbling the name "Bobby" while sitting with his head in his hands. Defendant did not threaten H.F. When H.F. shined a flashlight in his face, defendant got up and went back downstairs. Nothing was taken from the residence. H.F. identified the defendant in court as the man who broke into her home.

Officer Bill Trosper testified he found a broken window and a left black tennis shoe in the basement of H.F.'s residence. Trosper followed tracks from the residence depicting the print of a left bare foot and a right tennis shoe.

Deputy Sheriff Cash Cook testified he too followed footprints leading from the Central Street area to a locomotive railroad yard in Tilton. The train master had reported an individual was seen entering a train. Cook found defendant crouched in a locomotive. He was wearing a shirt, pants, and only his right black tennis shoe. The deputy took defendant to the residence of H.F., where she identified him as the intruder. On cross-examination, Deputy Cook said defendant appeared intoxicated at the time he was taken into custody. No stolen items were found on his person.

Sergeant Gary Miller testified he assisted in investigating the D.W. and H.F. break-ins and was present on January 25, 1988, when defendant gave a taped statement to him and Investigator John Howard. Miller said defendant was read the *Miranda* rights, which he then read back and initialed. Defendant said he understood his rights and agreed to talk to the officers without having been threatened or promised anything.

Karen Kucharik, a forensic pathologist, testified she performed a chemical test on the torn nightgown and panties of D.W. The tests were all negative for the presence of semen or saliva. A microscopic test for spermatozoa was negative as well. Kucharik also tested vaginal, rectal, and oral swabs taken from D.W. at the hospital and the results were similarly negative. On cross-examination, Kucharik said none of the tests conducted indicated D.W. had experienced sexual intercourse the night of the home invasion. Her investigation did not indicate defendant committed a sexual offense against D.W.

Kevin Horath, a latent print examiner, testified no latent fingerprints recovered at the D.W. residence matched the actual prints belonging to defendant. Horath said it is possible to touch items in a house without leaving prints.

Investigator John Howard testified he investigated the scene of the D.W. break-in on January 24, 1988. Howard found a window had been broken, the home ransacked, and several items moved within the

home. Howard dusted some objects at the scene in an attempt to recover latent fingerprints. He indicated it is unusual to find a suspect's prints at the scene of a crime.

Howard first talked to defendant on January 24, 1988, around 7 a.m. after he was arrested in connection with the recent break-ins. Officer Gary Miller was also present. After having read and signed the constitutional rights warning and waiver form, defendant admitted he broke into the H.F. residence in an attempt to get warm after he had wrecked his car. Defendant told the officers that prior to the wreck he had been drinking at his brother Bobby Treadway's house. He denied having been in the King Street area or within the D.W. residence.

Howard testified he next talked to defendant on January 25, 1988, at approximately 11:45 a.m., again in the presence of Sergeant Gary Miller. Defendant was a second time advised of his *Miranda* rights, after which he read and initialed the waiver form. Howard denied threatening defendant, making promises, or discussing the details of the D.W. break-in before defendant made his statement. However, he admitted the officers originally told defendant they were investigating a complaint of criminal sexual assault and asked defendant if he had entered the residence on King Street. Initially, defendant again denied involvement in the D.W. break-in, but later, after changing his story several times, admitted the following in a taped statement, which was played in open court before the jury.

Defendant indicated he read and signed the waiver form. He said on January 23, 1988, he was on his way to the liquor store, but instead decided to go home. He stopped on King Street because that was where he thought he lived. He went up to a residence, tried his key, and when it would not work he forced the door open. Defendant then entered the residence, went through some drawers in an attempt to find some of his clothes, and got in bed with a woman he thought was his wife. Defendant had sex with the woman and forced her to perform an act of fellatio. When the woman cried "rape," defendant said he took a VCR "and some other stuff" and left. Defendant did not know what he did with those items. Defendant first became aware he was not in his own home while in the King Street residence when he realized he was making love to a woman who was not his wife. He did not know the reason why he took the items out of the King Street residence after that realization.

After he left the residence on King Street, defendant said he was on his way back to his brother's house when he wrecked his car. After the wreck, defendant got out of the car and began running. He ran

across some tracks to another house, where he broke out a basement window and entered the residence in an attempt to get warm. Defendant tried to find a place to lie down so he could sleep and sober up. After a woman shined a flashlight on him, defendant talked to her awhile and told her his name was Bobby Treadway. When the woman threatened to call the police, defendant went back out the basement window. He then climbed into a train engine in order to keep warm. Defendant fell asleep inside the train and woke up when the sheriff found him.

When the trial continued on May 18, 1988, Dr. Ben Welch testified he examined D.W. in a hospital emergency room on January 24, 1988. D.W. told the doctor she thought she had been sexually assaulted, but could not recall any sexual penetration. Dr. Welch recalled D.W. seemed drowsy and slightly confused. A thorough examination of D.W. revealed no evidence of trauma to her genitalia, face, neck, or elsewhere. The tests performed did not show any sperm present in the vaginal area. Bathing does not remove sperm located deep within the vagina. On cross-examination, Dr. Welch testified that 50% of the time there is no evidence of trauma in rape cases, if the victim does not resist. The doctor opined that if the victim passed out before the penetration occurred, he would not expect to find any visible signs of trauma to the vaginal area.

At the close of the State's evidence, defendant made a motion for a directed verdict as to counts I through VIII, alleging there was no evidence of criminal intent when defendant entered the D.W. residence, and further, no evidence a sexual assault had in fact occurred. The motion was denied.

The defendant testified on his own behalf. He said that on January 23, 1988, around 7:30 p.m., he went to his brother's house in Tilton where he ate, played cards, drank, and watched a movie. Around 9:30 p.m. he left to go to the liquor store in Danville. After purchasing some liquor, defendant hit a telephone pole while on the way back to his brother's house. Defendant then ran to Central Street, where he kicked in and entered the basement window of a residence because he was cold. Defendant remembered he went upstairs and sat at the kitchen table until a woman shined a light on him. He then exited the same way he came in, walked to a train, and crawled inside until the sheriff found him.

Defendant told the jury he had admitted to the police all along he had entered what he later learned was the H.F. residence. According to defendant, Officer Howard asked him if he had also raped a woman on King Street. Howard was not satisfied with defendant's denial of

that offense. Defendant said the officers told him they had evidence he had raped and robbed D.W., so defendant said he confessed just to keep them from bothering him. On cross-examination, defendant admitted he read and waived his constitutional rights. He explained he made the statements contained in the recorded interview only because the officers told him to and because they said nothing bad would happen to him. Defendant lied to the officers in order to stay out of trouble.

The testimony of Reverend J.T. Riggs for the defense was not allowed as to his knowledge of a specific act evidencing defendant's propensity to admit to crimes he did not commit. An offer of proof was made outside the presence of the jury wherein Riggs testified he once suspected defendant of stealing some tools in 1986. When defendant was confronted, he initially denied the theft, but later confessed. Riggs said he immediately returned to the jobsite and found the tools in a locked room where he had left them. When Riggs later apologized to defendant and asked him why he confessed to something he did not do, defendant said he did it so that Riggs would not be angry.

The jury found defendant guilty of the offenses of residential burglary, aggravated criminal sexual assault, criminal sexual assault, theft (over $300), criminal damage to property, criminal trespass to property, and criminal trespass to residence. Defendant was acquitted of counts II, IV, and VI. He was sentenced to concurrent terms of 10 years for residential burglary, 25 years for aggravated criminal sexual assault, 5 years for theft (over $300), 1 year for criminal damage to property, and 1 year for criminal damage to residence.

First, defendant argues the trial court improperly denied the pretrial motion to suppress his tape-recorded confession. According to defendant, he was not capable of knowingly, voluntarily, or intelligently waiving his rights under the principles of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. Defendant maintains his low level of intelligence enabled the police officers to coerce a confession from him. In support of this contention, defendant points to the evidence heard at the suppression hearing and at trial that the investigating officers were aware defendant had only a tenth-grade education and was in emotional distress at the time they took his statement. Defendant testified he could not read or write adequately; however, the interrogating officers recalled he read aloud the waiver form slowly, but with little difficulty.

Defendant further argues he confessed after 30 hours of incarceration only because of the investigators' pressure. Defendant points

out he did not confess to the D.W. break-in until the second interview and only after the officers told him the details of the offense and relentlessly questioned him over a long period of time. Defendant felt the only way to escape the pressure was to confess to something he did not do. According to defendant, the persistent and intense questioning by the police combined with the low intelligence of defendant caused him to confess involuntarily without knowing the consequences of his statement.

Defendant relies on *In re T.S.* (1986), 151 Ill. App. 3d 344, 502 N.E.2d 761, wherein this court held the trial court improperly admitted into evidence the confession of T.S., a 15-year-old male enrolled in an "alternative school," who had limited experience in criminal matters. The court noted the police gave T.S. false information regarding the evidence against him and offered him leniency if he confessed. Furthermore, the evidence showed T.S. was not read his *Miranda* warnings until after he gave a full oral admission and was asked to give a typewritten statement of the same. The court concluded the totality of the circumstances indicated the confession was involuntary and inadmissible "in light of the intimidating, coercive, and deceptive atmosphere of the interrogation." (*In re T.S*, 151 Ill. App. 3d at 351, 502 N.E.2d at 766.) Defendant argues the same naivety, educational deficiency, misrepresentations, and pressure were present in this case.

The State properly distinguishes *In re T.S.*, first on the grounds T.S. was not read his *Miranda* rights until after he made his oral admission. Here, defendant read aloud and signed the waiver forms prior to both interviews. In his taped statement defendant admitted he had read and initialed the form advising him of his constitutional rights before the interview began. He did not have any questions about those rights and agreed to speak with the officers. Unlike T.S., this defendant was not unfamiliar with the criminal justice system or the procedure commonly used to inform an accused of his rights.

Next, in *In re T.S.* there was ample unrefuted evidence that suggested coercion and intimidation on the part of the interrogators. The State argues the record does not show there was a coercive atmosphere during the interview in this case. The officers testified defendant seemed upset during the interrogation, a condition not unusual under the circumstances. Although defendant testified the officers were verbally abusive and promised leniency if he confessed, the officers denied using coercive tactics to force a confession.

Finally, the State argues defendant's lower than normal intelligence is not by itself a sufficient reason to find he was unable to make a voluntary confession. (*People v. Hester* (1968), 39 Ill. 2d 489,

237 N.E.2d 466; *People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677; *People v. Avery* (1980), 88 Ill. App. 3d 771, 410 N.E.2d 1093.) However, as noted in his reply brief, defendant's argument is not hinged solely on his low intelligence quotient. In fact, defendant's IQ was never measured. Instead, defendant properly points to the totality of circumstances surrounding his confession, which include his intelligence, experience, and the environment in which the statement was given.

■■ ■ The totality of circumstances test is to be applied by a trial court to determine whether a defendant knowingly, intelligently, and voluntarily waived his constitutional rights under *Miranda*. (*People v. Johnson* (1973), 55 Ill. 2d 62, 302 N.E.2d 20.) The question is whether the confession was made freely, voluntarily, and without any compulsion or inducement of any sort (*Hester*, 39 Ill. 2d 489, 237 N.E.2d 466), or whether the accused's will was overborne. (*People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508.) Factors to be considered when making a determination of voluntariness include any deception on the part of the police (*People v. Martin* (1984), 102 Ill. 2d 412, 466 N.E.2d 228), "the age, education, and intelligence of the accused, the duration of questioning, and whether he received his constitutional rights or was subjected to any physical punishment" (*In re T.S.*, 151 Ill. App. 3d at 350, 502 N.E.2d at 765). The accused's emotional state and experience in criminal matters are also relevant. (*Hester*, 39 Ill. 2d 489, 237 N.E.2d 466; see *North Carolina v. Butler* (1979), 441 U.S. 369, 60 L. Ed. 2d 286, 99 S. Ct. 1755.) The court need not be convinced beyond a reasonable doubt the statement in question was voluntary. (*People v. McDermott* (1985), 141 Ill. App. 3d 996, 490 N.E.2d 1293; *People v. McKinney* (1983), 117 Ill. App. 3d 591, 453 N.E.2d 926.) When a trial court has ruled on the question after applying the proper legal standard, the sole question for review is whether the trial court's determination was contrary to the manifest weight of the evidence. *Johnson*, 55 Ill. 2d 62, 302 N.E.2d 20; *People v. Aldridge* (1980), 79 Ill. 2d 87, 402 N.E.2d 176; *People v. Brownell* (1980), 79 Ill. 2d 508, 404 N.E.2d 181.

■ The record reveals the trial court applied the proper standard for determining the voluntariness of the confession. At the conclusion of the hearing on the motion to suppress, the trial court, in view of the evidence and observations of defendant at prior proceedings, held defendant's statement was made knowingly and voluntarily. The evidence supports the trial court's decision.

The pertinent facts are that defendant had been in custody for 30 hours when he gave his taped confession. Defendant was interviewed

twice during that time: first on January 24, 1988, between 7:34 a.m. and 8:05 a.m., and again the next day between 10:45 a.m. and 12:05 p.m. The taped statement was taken during the second interview, on the 25th. The time spent questioning defendant was not unreasonable, and the duration of his custody was necessary because defendant was arrested late Saturday night, on January 23, 1988. Defendant was confined in a holding cell between interviews. Defendant does not contend he was kept awake during that time or denied food or water. The record further shows defendant was properly "Mirandized" prior to his confession. Defendant read and signed a form containing the *Miranda* warnings prior to each interview. He also acknowledged at the outset of the taped confession he had read, signed, and understood his constitutional rights and was willing to make a statement to the police. The evidence showed defendant dropped out of school during tenth grade. Defendant claimed he could not read or write very well; however, he read the waiver form aloud both times before signing. The officers said he read slowly, but without difficulty. Defendant did not have any questions about his rights before he waived them.

Finally, the only evidence of coercion is from defendant's testimony the officers "yelled at him" and promised him "nothing bad would happen." The officers denied they made any promises or threats. The trial court was in the best position to weigh the testimony of the officers against that of defendant.

Given the fact defendant indicated three times he read and understood his rights, it is apparent he voluntarily chose not to exercise those rights when he made a full tape-recorded confession of the crimes. (See *People v. Brooks* (1972), 51 Ill. 2d 156, 164, 281 N.E.2d 326, 332.) The manifest weight of the evidence does not suggest defendant lacked the mental capacity or was coerced such that his confession was involuntary. The motion to suppress was properly denied.

Next, defendant maintains his confession of the crimes that occurred at the D.W. residence was insufficiently corroborated by independent evidence of his guilt.

█ The *corpus delicti* of a crime requires proof (1) a crime was committed and (2) the crime was committed by the person charged. (*People v. Lambert* (1984), 104 Ill. 2d 375, 472 N.E.2d 427; *People v. Webb* (1987), 153 Ill. App. 3d 1055, 506 N.E.2d 801.) In order to establish the *corpus delicti*, there must *first* be some evidence, exclusive of an extrajudicial confession by the defendant, tending to show the crime actually occurred. (*People v. Willingham* (1982), 89 Ill. 2d 352, 432 N.E.2d 861.) This evidence need not be established beyond a rea-

sonable doubt. (*People v. Perfecto* (1962), 26 Ill. 2d 228, 229, 186 N.E.2d 258, 259.) Once the required proof has been established and if the evidence of the criminal act corroborates the facts contained in the defendant's confession, then that evidence may be considered together with the confession in determining whether the *corpus delicti* was sufficiently proved. (*Perfecto*, 26 Ill. 2d at 229, 186 N.E.2d at 259; *Willingham*, 89 Ill. 2d at 361, 432 N.E.2d at 865; *Lambert*, 104 Ill. 2d at 379, 472 N.E.2d at 429.) In other words, the *corpus delicti* cannot be proved by the defendant's confession alone; the confession must be corroborated. (*Lambert*, 104 Ill. 2d at 378-79, 472 N.E.2d at 428.) The proper application of the rule has been described as follows:

"[I]n the absence of any evidence independent of the confession clearly showing a crime to have been committed by some person and in the further absence of evidence of other facts or circumstances so fully corroborating the confession as to show the commission of the offense beyond a reasonable doubt, the rule that the *corpus delicti* cannot be proved by the confession of a defendant alone must be applied." *People v. Lueder* (1954), 3 Ill. 2d 487, 489-90, 121 N.E.2d 743, 744.

The corroboration requirement is necessary to avoid a false confession. (*People v. O'Neil* (1960), 18 Ill. 2d 461, 165 N.E.2d 319; *Webb*, 153 Ill. App. 3d 1055, 506 N.E.2d 801.) The requirement of corroboration recognizes the reliability of a confession " 'may be suspect if it is extracted from one who is under the pressure of a police investigation—whose words may reflect the strain and confusion attending his predicament rather than a clear reflection of his past.' *Smith v. United States* (1954), 348 U.S. 147, 153, 99 L. Ed. 192, 199, 75 S. Ct. 194, 197." *Willingham*, 89 Ill. 2d at 359, 432 N.E.2d at 864.

Defendant argues the evidence presented by the State as to counts I through VIII pertaining to the D.W. break-in did not provide the corroborating evidence necessary to prove him guilty beyond a reasonable doubt. First, defendant asserts there was no independent evidence presented by the State that defendant committed the crimes of criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)) or aggravated criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(a)(5)).

Section 12—13(a) of the Criminal Code of 1961 (Code) provides: "The accused commits criminal sexual assault if he or she: (1) commits an act of sexual penetration by the use of force or threat of force." (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(1).) The offense is aggravated if the victim was 60 years of age or over when the offense was committed. (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(a)(5).) Sexual

penetration is defined in section 12—12(f) of the Code as follows:

"[A]ny contact, however slight, between the sex organ of one person and the sex organ, mouth or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including but not limited to cunnilingus, fellatio or anal penetration. Evidence of emission of semen is not required to prove sexual penetration." Ill. Rev. Stat. 1987, ch. 38, par. 12—12(f).

Defendant does not object to the proof of D.W.'s age. Rather, he contends there is no independent evidence D.W. was sexually assaulted, let alone that he was the perpetrator. In support of his argument the crime did not occur, defendant points to D.W.'s testimony that she did not remember any sexual contact or penetration the night her home was broken into on January 23, 1988. Defendant cites *Lambert* (104 Ill. 2d 375, 472 N.E.2d 427) and *People v. Kokoraleis* (1986), 149 Ill. App. 3d 1000, 501 N.E.2d 207, as authority for his argument.

In *Lambert*, the only evidence independent of the defendant's confession that he engaged in deviate sexual conduct with a four-year-old boy was that he and the boy slept in the same room one night two to three weeks before the boy's mother noticed his rectum appeared pink and swollen. The State failed to provide proof the boy's physical condition was caused by a criminal act. The court held the defendant's confession was not sufficiently corroborated by independent evidence. In *Kokoraleis*, the victim's pants were found separated at the inseam five months after her death. The court did not find that evidence independently corroborated defendant's confession that a rape occurred.

The State relies on *Perfecto* (26 Ill. 2d 228, 186 N.E.2d 258), wherein the State's evidence did not prove the element of penetration, but the evidence taken as a whole left no doubt a rape occurred and was committed by the defendant. In *Perfecto*, the defendant confessed he twice visited the room of the 75-year-old victim one evening where, after she resisted his advances, he beat her and had intercourse with her. An eyewitness who had been drinking with defendant in his room that night saw defendant leave the room and reenter holding a handkerchief to his face. Later, the witness left the defendant's room and returned to find defendant again absent. The witness then noticed the light in the victim's room go on and off and the door shake. The witness saw defendant exit from the victim's room a short time later and saw scratches and a bite mark on the defendant's shoulders. The victim's room was disheveled and she was found bleed-

ing, bruised, and suffering from a broken collarbone. The court found there was independent evidence the crime of rape occurred and that evidence corroborated defendant's confession that he committed the rape.

Defendant argues the State's reliance on *Perfecto* is misplaced because in that case substantial eyewitness testimony corroborated the defendant's confession. Furthermore, in *Perfecto,* the independent evidence that a rape occurred was that the victim apparently physically fought off the defendant's advances and suffered physical injury to herself as a result. In this case, there was no physical evidence that D.W. experienced a sexual attack, other than her torn nightclothes. Defendant points out that in *Kokoraleis,* torn clothing alone was found to be in and of itself insufficient to support a verdict of rape.

At this point it is necessary to review the facts in the case before us. D.W. testified she took two sleeping pills around 7:30 p.m. the night of the break-in. Her only memories of the evening after that time were of the feeling of someone grabbing her in the chest area, the fact that she screamed and that she bathed before going to the hospital. D.W. knew her nightgown and panties had been torn while she was asleep, but she did not know how it happened.

Dr. Ben Welch testified he examined D.W. as if she were a rape victim. D.W. told him she thought she had been sexually assaulted but did not remember any sexual contact other than the feeling of someone on top of her. The doctor could not find any evidence that D.W. had been sexually assaulted. He said there was no evidence of trauma to her genitalia, face, legs, or elsewhere, and no trace of sperm was discovered. Forensic scientist Karen Kucharik also testified the lab reports were all negative for sperm and the hair samples taken from defendant were not similar to those recovered at the scene. Kucharik admitted her investigation did not indicate defendant committed a sexual offense against D.W. The only independent evidence tending to establish D.W. was sexually assaulted was the testimony of L.W. that upon finding her mother crouched on the floor of the bedroom, D.W.'s first words were: "I have been raped." In addition, D.W. testified she felt someone grab her in the chest area, which prompted her to scream. The torn nightgown and panties further suggest force was used. There was no trace of trauma or sperm on D.W.'s body; however, Dr. Welch testified the absence of trauma to the genitalia of a rape victim is not unusual, if the victim was unconscious at the time penetration occurred. The doctor further stated he would expect that hair and sperm of the attacker deposited outside the vaginal canal would be washed away if the victim bathed after the attack. It is un-

disputed D.W. took two sleeping pills before she was attacked and took a bath before she was examined by Dr. Welch.

■■ The State points out the statute does not require proof of evidence of semen to prove that sexual penetration occurred. (Ill. Rev. Stat. 1987, ch. 38, par. 12—12(f).) In *People v. Du Pree* (1987), 161 Ill. App. 3d 951, 514 N.E.2d 583, the victim complained to the police she had recently been sexually assaulted both orally and vaginally by the defendant. The police found the victim in a confused state with a wound to her forehead. The test results administered to complainant revealed there was no semenal material found. The court found the victim's prompt complaint provided sufficient corroborating evidence to sustain the defendant's conviction. The court noted "the lack of physical evidence of a sexual assault is not fatal to the State's case and not required to prove the commission of the sex crime." (*Du Pree*, 161 Ill. App. 3d at 961, 514 N.E.2d at 589.) The State relies on *Du Pree* for its argument that, although there was no evidence of semen on D.W., the fact she promptly complained to her daughter Lisa that she had been raped was sufficient evidence that a rape in fact occurred. We agree.

When examined as a whole, we conclude the evidence aliunde the confession tends to establish an act of sexual penetration of D.W. occurred on January 23, 1988. D.W. testified she screamed when she felt someone grab her in the chest area. She was heavily sedated at the time. When she awoke, her nightgown and panties were torn. She promptly complained of rape to her daughter, who found her crouched in a corner of a bedroom, and again to Dr. Welch when she was examined at the hospital. When examined as a whole, this independent evidence was sufficient to show the sex crimes charged were in fact committed, even though the State had no physical evidence of penetration.

The next level of inquiry is whether the independent evidence corroborates or bolsters the facts contained in defendant's confession. Defendant admitted the following in a taped statement to the police:

> "I went inside and went through some drawers and stuff and went and got in bed with the lady that was there, and thought it was my wife. I had sex with her and I had her give me a blow job. *** I got up *** went through some more things, and then she started yelling rape, so I took some stuff and left."

We conclude that D.W.'s recollection of being grabbed and of screaming, coupled with her torn nightclothes and her prompt complaint to L.W. and Dr. Welch, were sufficient evidence to corroborate defendant's confession that he had sex with a woman in the D.W. resi-

dence that was not his wife, and to establish the *corpus delicti* of the counts alleging aggravated criminal sexual assault. (Ill. Rev. Stat. 1987, ch. 38, par. 12—13(a)(1).) The same evidence also supports the finding by the jury of defendant's guilt beyond a reasonable doubt of those sex crimes.

We similarly reject defendant's argument the State also failed to provide evidence sufficient to corroborate his confession as to the crimes of residential burglary (Ill. Rev. Stat. 1987, ch. 38, par. 19—3), theft (Ill. Rev. Stat. 1987, ch. 38, par. 16—1(a)(1)), and criminal damage to property (Ill. Rev. Stat. 1987, ch. 38, par. 21—1(a)).

A person commits the offense of residential burglary if he "knowingly and without authority enters the dwelling place of another with the intent to commit therein a felony or theft." (Ill. Rev. Stat. 1987, ch. 38, par. 19—3(a).) A person commits the offense of theft if he "knowingly: (a) Obtains or exerts unauthorized control over property of the owner; *** and (1) Intends to deprive the owner permanently of the use or benefit of the property." (Ill. Rev. Stat. 1987, ch. 38, par. 16—1(a)(1).) A person commits the offense of criminal damage to property if he "[k]nowingly damages any property of another without his consent." Ill. Rev. Stat. 1987, ch. 38, par. 21—1(a).

The following is independent evidence that said crimes in fact occurred: The front door windowpane of D.W.'s residence on King Street was broken between the hours of 8 p.m. of January 23, 1988, and 2 a.m. on January 24, 1988. The house had been ransacked. Drawers in the living room and bedrooms were open and personal papers and clothing scattered. The television had been moved from the bedroom to the front porch, a china clock was sitting by the front door and a jewelry box was transported from the bedroom to the living-room couch. The VCR, checkbook, and some cash were missing. The VCR and a transistor radio were found in some brush in the yard of D.W.'s residence.

In his statement to the police, defendant said he "forced the door in" at a residence on King Street that he thought was his own home. Once within the house, defendant said he went through drawers looking for some of his clothes. Defendant admitted he "took a VCR and some other stuff" after he realized he was not in his own home. Defendant did not remember what he did with the stolen items. Nothing was found on defendant's person or in his car at the time he was arrested.

■ We find the independent evidence that showed the crimes of residential burglary, theft, and criminal damage to property occurred sufficiently corroborated defendant's confession. Proof of defendant's

intent to commit a theft upon entry to D.W.'s house was his admitted immediate act of rummaging through drawers. Defendant said he was searching for some of his own clothing, but the investigation showed a hutch in the dining room full of personal papers was also ransacked. Defendant admitted he took a VCR and other items after he realized he was not at home. Proof of unauthorized control over the VCR was that it was found in the yard. Such proof explained defendant's inability to remember what he did with the stolen items and the fact they were not found in his possession. Proof that the front windowpane was broken also corroborated defendant's confession he forced his way in through the front door. Accordingly, we find the *corpus delicti* of residential burglary, theft, and criminal damage to property were sufficiently proved by the State and defendant was proved guilty of those crimes beyond a reasonable doubt.

Section 111—4(a) of the Code of Criminal Procedure of 1963 (Code of Criminal Procedure) states the law pertaining to the joinder of offenses. That provision states:

> "Two or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are based on the same act or on 2 or more acts which are part of the same comprehensive transaction." (Ill. Rev. Stat. 1987, ch. 38, par. 111—4(a).)

Defendant argues the two separate break-ins at the D.W. and H.F. residences did not constitute acts which were part of the same comprehensive transaction. Defendant maintains the trial court improperly denied his pretrial motion to sever the charges pertaining to the D.W. break-in from those crimes alleged to have been committed at the H.F. residence. The motion was made pursuant to section 114—8 of the Code of Criminal Procedure. Section 114—8 states:

> "If it appears that a defendant or the State is prejudiced by a joinder of related prosecutions or defendants in a single charge or by joinder of separate charges or defendants for trial the court may order separate trials, grant a severance of defendants, or provide any other relief as justice may require." (Ill. Rev. Stat. 1987, ch. 38, par. 114—8.)

Defendant suggests the court's refusal to grant a severance deprived him of a fair trial. He claims the jury convicted him of the offenses related to the D.W. break-in solely because of the compelling nature of the State's case against him as to the H.F. break-in.

▪ Some of the factors to consider in determining whether offenses are part of the same comprehensive transaction for purposes of

joinder are their proximity in time and location, the identity of evidence to be presented, similarities in the acts, and whether there was a common method of operation by the perpetrator. (*People v. Harris* (1986), 147 Ill. App. 3d 891, 498 N.E.2d 621.) A trial court's decision whether or not to grant a motion to sever is a matter of discretion and will not be reversed on appeal absent an abuse of discretion. *People v. Mikel* (1979), 73 Ill. App. 3d 21, 391 N.E.2d 550.

The trial court found the offenses charged in this case were sufficiently similar and close in place and time to warrant joinder of all counts for trial. It relied on the reasoning in *People v. Tate* (1982), 106 Ill. App. 3d 774, 436 N.E.2d 272, and *Mikel* (73 Ill. App. 3d 21, 391 N.E.2d 550), in denying defendant's motion to sever. In *Tate*, the first offenses charged were attempt (rape) and home invasion, while the other offenses involved a separate home invasion and aggravated battery. The two incidents occurred about one hour apart. This court held the trial court properly refused to sever when the victims gave similar descriptions of their assailant, the victims were both females who were attacked at knife point, and the assailant attempted to remove the victims' clothing and fled when he met resistance. The court termed the series of offenses a "spree of lust." *Tate*, 106 Ill. App. 3d at 777, 436 N.E.2d at 275.

In *Mikel*, the first aggravated assault and the murder occurred less than two city blocks apart and the distance between the murder and the second aggravated assault was a few miles. This court found the alleged actions were part of a "shooting spree" and "thus, were part of the same general transaction or scheme and show a common motive, design and method of operation." *Mikel*, 73 Ill. App. 3d at 27-28, 391 N.E.2d at 555.

Defendant argues the court's reliance on *Tate* and *Mikel* was misplaced when, in this case, there existed no similarity in time, place, or circumstances between the crimes charged at the separate residences. Defendant lists the following dissimilarities: (1) the State could only guess that the offenses at the D.W. residence occurred between 8 and 11 p.m. on January 23, 1988. The offenses at the H.F. residence occurred at 10:15 p.m.; (2) the houses are located four to five blocks apart; (3) a pane in the front door of the D.W. residence was broken to gain entry, while at the H.F. residence a basement window was broken; (4) theft and a general ransacking took place at the D.W. residence, while at the H.F. residence defendant did not attempt to steal anything, rather he sat quietly at the kitchen table; and (5) substantial allegations of sexual conduct were alleged to have taken place at the D.W. residence, while none was reported at the H.F. residence.

Defendant maintains the facts in *People v. Bricker* (1974), 23 Ill. App. 3d 394, 319 N.E.2d 255, are more readily comparable to this case. In *Bricker*, this court held the two counts of armed robbery charged were sufficiently different when the evidence revealed there was a three-hour delay between the robberies. Furthermore, several miles separated the first armed robbery of a service station located south of Bloomington and the second of a hotel located in downtown Bloomington. In finding improper joinder, this court noted nothing in the record established a common plan or action linking the two crimes.

Relying on *Tate* and *Mikel*, the State argues the motion to sever was properly denied in this case because of the similarities of the crimes and their close proximity in time and location. We agree. The D.W. break-in occurred after 8 p.m. on January 23, 1988. The H.F. break-in happened at 10:15 that same night while Mrs. H.F. was watching television. In response to the court's request for more information regarding the location of the two houses, the assistant State's Attorney said the actual distance between the two houses was about 1 to 1½ blocks, but that the houses were separated by a railroad track such that if a person were driving from one house to the other he would have to drive around the track. Thus, the actual distance between the two houses is less than the travel time suggests. The theory advanced by the State was that defendant had a car wreck after fleeing the D.W. residence. He then abandoned the car and traveled on foot across the railroad tracks to the H.F. residence.

Windowpanes were broken in both residences to gain access: the front door window at the D.W. residence and a basement window at the H.F. residence. Furthermore, as was the situation in the *Tate* case, the evidence showed that the perpetrator in both incidents fled the scene of the crime when he encountered resistance. Defendant admitted in his statement to the police that he left the house on King Street when the woman began to scream. H.F. said the man, later identified as defendant, who entered her house on January 23, ran back down the basement stairs and went out the window after she shined a flashlight on him in the kitchen.

■ We agree the trial court did not abuse its discretion when it denied defendant's motion to sever. Defendant confessed to entering a house on King Street and committing therein the crimes charged in counts IX through XI. After fleeing the D.W. residence, defendant admitted he wrecked his car and began running across some railroad tracks and over to another house, where he broke out a basement window and entered in order to keep warm. This testimony was cor-

roborated by the evidence that the offenses occurred on the same night and around the same time. The crimes occurred in a small town, Tilton, Illinois, within several blocks of each other. The method of entry into both residences was similar and the perpetrator fled in both cases when he encountered resistance. On this evidence, the motion to sever was properly denied.

The next issue for discussion is whether the trial court properly excluded testimony which would have related an instance of prior false confession by defendant.

The record reveals defendant called Reverend J.T. Riggs as a witness during his case in chief. When defense counsel inquired whether Riggs had ever known defendant to have confessed to a criminal act he did not commit, the State objected. At a side-bar conference the State argued the witness could testify as to defendant's reputation, but was prohibited by the rules of evidence from commenting on specific acts. Defense counsel argued the witness' testimony went to the voluntariness of the confession and would show defendant's mental makeup was such that if pressured he was prone to make false confessions. The court held the testimony was inadmissible, but allowed defendant's offer of proof.

Riggs told the court he had previously accused defendant of stealing tools. Defendant initially denied the theft, but later confessed after Riggs insisted he was guilty. Later, Riggs discovered he had merely misplaced the tools and that defendant did not steal them. Defendant told Riggs he confessed so that Riggs would not be angry.

On appeal, defendant concedes the rule that specific acts cannot be offered to prove the reputation or character of an accused. (*People v. Goodwin* (1981), 98 Ill. App. 3d 753, 424 N.E.2d 429.) However, defendant argues testimony which is probative as to the voluntariness of a confession and which relates to the emotional characteristics of the accused is admissible, even if it relates a specific incident or act. (*In re T.S.* (1986), 151 Ill. App. 3d 344, 502 N.E.2d 761; *People v. Hester* (1968), 39 Ill. 2d 489, 237 N.E.2d 466.) The State notes neither case cited by defendant involved the issue of admissibility of a prior false confession.

In *In re T.S.*, the court held a confession was involuntary when the accused, a young boy, was not timely given his *Miranda* warnings and the evidence revealed the confession was the product of improper police interrogation. In *Hester*, the court discussed the factors that should be considered when determining the voluntariness of a confession, which include the age, education, and emotional characteristics of the accused. The court did not hold that proof of a prior false con-

fession by the accused is admissible on the issue of the voluntariness of a confession.

 In this case, the trial court heard evidence pretrial as to the voluntariness of defendant's confession. Defendant did not call Riggs at that time in an attempt to show defendant was predisposed to make false confessions. Even though the trial court was unpersuaded by defendant's argument his confession was involuntary, defendant argues the jury was entitled to independently decide the issue of voluntariness after hearing testimony as to defendant's character. Defendant claims he argued for the admission at trial of Riggs' testimony as to the prior false confession for the limited purpose of showing defendant's character was such that he would give a false confession in order to avoid anxiety.

Defendant cites *People v. Garlick* (1977), 46 Ill. App. 3d 216, 360 N.E.2d 1121, to support his contention Riggs' testimony was relevant to prove defendant's character. In *Garlick*, defendant was convicted of murdering his wife. Defendant presented an insanity defense at trial. On appeal defendant argued the trial court erred in finding him fit to stand trial. The appellate court agreed and found defendant was entitled to a new competency hearing and possibly a new trial. The court found it was error for the trial court to disallow the testimony of defendant's mother and sister concerning an unfounded statement defendant made just prior to the murder that he only had six months to live. The court found the statement was relevant to the issue of defendant's mental state.

Unlike the defendant in *Garlick*, the defendant in this case did not present a defense of insanity at trial. Defendant called Riggs to testify as to the prior false confession only to show defendant has a character flaw that causes him to admit to crimes he did not commit. Defendant did not argue this flaw was evidence of his insanity; rather, he intended to use the testimony to convince the jury his confession to the police was made involuntarily.

The question of voluntariness of the confession was resolved at the pretrial hearing. Accordingly, the testimony of Riggs as to specific instances of conduct by defendant was properly excluded by the trial court in this case. (*People v. Vilt* (1985), 139 Ill. App. 3d 868, 488 N.E.2d 580.) In *Vilt*, defendant was charged with various sex offenses involving bondage. The trial court excluded the testimony of a witness who would have testified she had consensual sex with defendant, at which time he asked her to engage in bondage. When she refused, defendant did not force her to comply with his request. On appeal, defendant argued the woman's testimony should have been admitted

to show defendant's character was such that he harbored "bondage fantasies," though would not force them on an unwilling partner. The appellate court held the testimony was properly excluded because it attempted to prove general reputation through testimony of an isolated incident of conduct.

Riggs was put on the stand to relate to the jury an isolated incident involving a prior false confession by defendant. The rules of evidence require that specific incidents of conduct may not be allowed to prove character; thus Riggs was properly disallowed to testify.

Next we consider whether the trial court erred in denying defendant's petition for appointment of an expert to determine his fitness to stand trial.

On February 23, 1988, the trial court heard evidence at the hearing on defendant's motion for appointment of an expert to determine his fitness to stand trial. Defendant told the court he was contemplating suicide and wanted to talk to a psychiatrist. The Department of Children and Family Services placed defendant in Adler Zone Center when he was six years old, and he was released at age 10. Defendant was admitted to Adolph Meyer Mental Health and Developmental Center when he was 16 after he attempted suicide while living in a group home. Defendant was placed in the group home because his mother could not handle him. Defendant testified he attempted suicide again when he was 18. He was a special education student in high school until he dropped out of school during the tenth grade. Defendant has been using marijuana and amphetamines since he was 16 years old. While incarcerated for the instant offense, defendant told his fellow inmates he was contemplating suicide. When he made similar statements to his attorney and other authorities, he was placed in a padded cell. Defendant was later removed from the special cell when he told the authorities he was "okay."

Defendant told the court he knew what offenses he was charged with, but did not understand them. The court questioned defendant about his past criminal history. Defendant said that four years ago he "pled guilty to four counts of burglary and was released with four months' time served and probation." He also had full recollection of other associations with the criminal justice system. Defendant said he understood why an attorney was appointed to represent him and that he was charged with sexual assault, burglary, and home invasion. Defendant indicated he did not understand what a trial is. Furthermore, he did not think he could help in the preparation of his defense because he "can't comprehend what people are saying." The court commented:

"Well, Mr. Stevens, you have answered every question that's been asked of you today. You have answered every question, which means that you have understood or comprehended what the questions were. You have answered every one of them."

Further testimony revealed defendant had never heard of and did not understand the meaning of certain words, including "dwelling place," "aggravated," and "unauthorized." However, defendant admitted he understood the words "residence," "theft," and "rape."

The court concluded it was unnecessary for defendant to be examined in order to determine his fitness to stand trial, stating:

"I think, based on the testimony in this case, based on the Court's observations of the Defendant, both at this hearing and *** when the preliminary hearing was held, and based on the Defendant's recollection of that hearing, based on the Defendant's demeanor in court today *** and the fact that he could answer or at least understand every question that was posed to him, although he might not have understood every word that was referred to, he could understand the questions *** and understand them sufficiently well. I think he understands the proceedings. I think he understands the charges; and although he may not understand every technical phrase of the case or the charges, I think that he has been appointed a competent counsel and that after sufficient time has been allotted by counsel to go over these matters with the Defendant, I think that the Defendant, based on my observations today, would be able to understand the charges completely and to cooperate in his defense.

*** I don't think there is a bona fide doubt as to his fitness being raised. I am not precluding that in the future, but the Court is satisfied that the Defendant is fit to stand trial, to understand the charges, and to cooperate in his defense; so the Petition will be denied."

Citing *People v. Harris* (1983), 113 Ill. App. 3d 663, 447 N.E.2d 941, defendant argues that on these facts, it was reversible error for the trial court to have refused to order a fitness examination and a fitness hearing. In *Harris*, the defendant was convicted of aggravated battery and robbery. At the sentencing hearing defense counsel advised the court defendant was unable to be present because he had attempted suicide both before and after his trial. Defendant's fitness to stand trial was not questioned anytime before or during the trial; however, an order was entered to determine if defendant was mentally fit to participate in sentencing. The report revealed defendant

had been in and out of mental health centers his whole life. Defendant was found mentally fit to participate in the sentencing process.

The appellate court recognized that the question whether a *bona fide* doubt has been raised as to a defendant's competency is usually within the sound discretion of the trial court. (*People v. Stanhope* (1969), 44 Ill. 2d 173, 254 N.E.2d 512.) However, since the trial judge did not make a finding as to defendant's fitness to stand trial and because the record indicated the trial judge was unaware of defendant's suicide attempts and mental history before trial, the appellate court felt obligated to reverse and remand for a new trial.

*Harris* is distinguishable. Here, the trial court heard evidence pretrial as to defendant's prior suicide attempts and history of confinement in mental health institutions. After questioning defendant at length, the court nonetheless concluded defendant was able to understand the proceedings and participate in the preparation of his own defense.

Courts often find a defendant is fit to stand trial even though he has a history of mental illness and suicide attempts, as long as he is able to understand the nature of the proceedings and the charges against him. In *People v. Branson* (1984), 131 Ill. App. 3d 280, 475 N.E.2d 905, the defendant argued the trial court abused its discretion in failing to appoint an expert to examine him. The court considered that question in addition to the question whether the trial court should have ordered a fitness hearing. According to the *Branson* court, "[t]he critical inquiry is thus whether the facts presented a *bona fide* doubt that defendant was able to understand the nature and purpose of the proceedings against him and was able to assist in his own defense." (*Branson*, 131 Ill. App. 3d at 288, 475 N.E.2d at 912.) The court noted defendant seemed to understand one-on-one conversations with his counsel, and held "the fact that defendant had previously attempted suicide and had been placing himself in life-threatening situations by refusing medical treatment did not necessarily raise a *bona fide* doubt regarding defendant's fitness to stand trial." *Branson*, 131 Ill. App. 3d at 289, 475 N.E.2d at 912.

In *People v. Bivins* (1981), 97 Ill. App. 3d 386, 422 N.E.2d 1044, the defendant had a nervous breakdown and a problem with alcohol before and after she was charged with murdering her husband. The appellate court found the trial court was not presented with any facts creating a *bona fide* doubt as to her fitness to stand trial. The defendant's lucid and articulate testimony plainly indicated to the court she understood the nature of the questions and the record showed she was able to adequately assist her counsel in preparation of her de-

fense. The court stated: "The mere fact that defendant suffers some mental disturbance or requires psychiatric treatment does not necessarily raise a *bona fide* doubt as to his ability to understand the nature and purpose of the proceedings against him or to assist in his defense." *Bivins*, 97 Ill. App. 3d at 389, 422 N.E.2d at 1047.

■■ The record indicates the trial judge based his decision to deny an expert examination and fitness hearing on his prior observations of defendant along with the latter's testimony at the hearing on the motion at issue. A reading of the transcript of the hearing supports the judge's conclusion an examination and hearing were not warranted because the facts did not create a *bona fide* doubt as to the defendant's fitness to stand trial. Defendant answered all questions coherently. His only confusion was brought about by some statutory terms and he indicated he understood the meaning of the synonyms of those terms. In spite of defendant's prior suicide attempts and experiences with the mental health system, we agree defendant was able, with some help from his attorney, to understand the nature of the proceedings and charges against him and to adequately assist in his defense. The trial court correctly held there was no question as to defendant's competency to stand trial.

Finally, we decide whether the trial court erred in sentencing defendant to 25 years' imprisonment for aggravated criminal sexual assault. Defendant argues the sentence imposed by the trial court was excessive.

■■ Defendant did not argue in the trial court, nor has he specifically argued on appeal, that it was improper for the trial court to consider the victim's age as an aggravating factor in sentencing because the victim's age was a necessary element of the offense of aggravated criminal sexual assault. We find this issue to be waived for purposes of appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 522 N.E.2d 1124, *cert. denied* (1988), 488 U.S. 917, 102 L. Ed. 2d 263, 109 S. Ct. 274.) Further, to the extent such consideration was improper, the weight placed on this factor was so insignificant that it did not lead to a greater sentence. (*People v. Bourke* (1983), 96 Ill. 2d 327, 449 N.E.2d 1338.) As we note below, the evidence supported the sentence imposed.

Aggravated criminal sexual assault is a Class X felony (Ill. Rev. Stat. 1987, ch. 38, par. 12—14(c)). For a Class X felony, the sentence shall not be less than 6 years and not more than 30 years. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(3).) At the sentencing hearing on August 16, 1988, the trial court heard the following evidence in aggravation and mitigation (Ill. Rev. Stat. 1987, ch. 38, pars. 1005—5—

3.1, 1005—5—3.2).

J.T. Riggs testified defendant is unable to handle the effects of alcohol and thus has a drinking problem. Riggs said he believed defendant could be a useful citizen if he receives treatment for his alcohol addiction. Riggs described defendant as a conscientious worker. Theresa Stevens testified she had been married to defendant for three years and that he had been a good husband. The couple did not have any children.

As an aggravating factor, the court took into consideration that defendant threatened serious physical harm to D.W. The court said, "fortunately[,] she wasn't physically permanently injured[;] however[,] she was physically violated in a way that no person should have to tolerate." The court noted there was no evidence defendant was intoxicated to the point he was not responsible for his actions. Defendant's problem with substance abuse and his mental problems did not excuse his conduct in the eyes of the court. The court did not accept defendant's theory that he mistakenly thought he was in his own home making love to his own wife, when he in fact was sexually assaulting D.W.

The court commented that defendant was not an innocent to the criminal justice system. The record indicates defendant was convicted of forgery in 1983 and placed on probation. In 1984, while still on probation, he was convicted of burglary and his probation was extended for two years. In 1986, defendant was placed under court supervision for driving under the influence, and in 1987 he was arrested for, and later convicted of, driving while his license was suspended. The court noted defendant had been given every possible chance to lead a life free of crime. He was granted probation not once, but twice. Defendant ruined his own chances in society. The court stated it was convinced defendant was likely to commit further crime if released. The only possible mitigating factor the court could see was defendant's mental history. The court gave that factor little weight because of its conclusion defendant knew the difference between right and wrong and was able to be responsible if he chose to.

As to the mental harm defendant caused D.W., the court said: "[E]very person, particularly an elderly or older person, lives in fear of something like this happening. And when it happens their lives probably will never be the same again." The fact defendant committed a crime against a person 60 years of age or older was considered by the court as a statutory factor in aggravation. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—5—3.2(b)(4)(ii).) D.W. was age 64 when she was sexually assaulted by the defendant.

In sentencing defendant, the trial court noted count V charging

criminal sexual assault merged into count III charging aggravated criminal sexual assault. The court explained the sentence imposed as follows:

"[T]he Court in this case has considered a maximum sentence, because of the circumstances of the case and because of all the things that I have discussed, and primarily because of the fact that you have had some mental disorders in the past, which apparently have even manifested themselves with suicide attempts. And again, I'm not saying that that excuses you, but I am considering that and I am therefore not going to sentence you to the maximum and that is for that reason and primarily that reason only. But on Count III I am sentencing you to the Illinois State Penitentiary for a period of 25 years and committing you to the Department of Corrections."

The court did not consider sentencing defendant to an extended term. Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—2.

Defendant argues his sentence was an abuse of discretion by the trial court. First, defendant argues the evidence did not show D.W. was physically harmed by defendant in such a way that would warrant the severe punishment the trial court imposed. Defendant maintains that neither the physical evidence nor D.W.'s recollection could appropriately establish that the aggravating factor of physical harm was present in this case. Second, defendant feels the trial court put too much emphasis on the age of D.W. He claims this was inappropriate when there was no testimony the victim's age facilitated the defendant's ability to complete the crime. Defendant points out the evidence showed D.W. was under the influence of sleeping pills when the attack occurred. He claims this was not a scenario where an elderly woman was strong-armed by a young man. Accordingly, while not clearly arguing that it was error, defendant contends the victim's age in this case was merely a necessary element for the purpose of charging him and should not be considered as an aggravating factor in sentencing.

Defendant points out several mitigating factors he believes should have countered the aggravating factors considered by the court so as to reduce his sentence. First, defendant again notes he did not exhibit any violent behavior. Defendant has overlooked the evidence D.W.'s nightgown and panties were torn. Second, defendant relies on his history of chronic behavior and substance abuse. Finally, defendant contends he is not inclined to commit further offenses and therefore does not deserve a near maximum term of imprisonment. The trial court recognized the weight of this argument when it pointed out defend-

ant's history of recidivism.

Defendant cites several cases in which the defendants were sentenced to near maximum terms when the crime of aggravated criminal sexual assault was committed in a comparably more heinous manner than in this case. In *People v. Helton* (1987), 153 Ill. App. 3d 726, 506 N.E.2d 307, this court sustained a trial court's discretionary imposition of a 25-year sentence for aggravated criminal sexual assault. In *Helton*, the defendant beat, raped, and urinated on his victim. The court found no abuse of discretion in the sentencing order given the serious and demeaning nature of the offense, the defendant's extensive criminal history, and the court's related conclusion that defendant was an unlikely candidate for rehabilitation. In *People v. McFarland* (1987), 161 Ill. App. 3d 163, 514 N.E.2d 72, *cert. denied* (1988), 487 U.S. 1209, 101 L. Ed. 2d 891, 108 S. Ct. 2855, the victim suffered serious injury and the crime involved more than one defendant. This court affirmed a 35-year term.

Defendant argues the facts in this case are dissimilar from those in the cases cited, yet the prison terms imposed in the latter cases are comparable to that imposed on this defendant. Defendant argues the aggravating circumstances in this case are minor compared to those in *Helton* and *McFarland*; hence, the trial court abused its discretion when it sentenced defendant to 25 years' imprisonment.

The State points out defendant's sentence is well within the statutory range of punishment for the crime he committed. The trial judge considered defendant's history of mental disorders and suicide attempts when he decided not to impose the maximum sentence of 30 years for the crime. Furthermore, the record indicates the trial court considered all the evidence in aggravation and mitigation before imposing the sentence. The State argues sentencing decisions are a matter of judicial discretion and should not be disturbed in this case when there is no evidence that the trial court abused its discretion.

■■■ ■ Supreme Court Rule 615(b)(4) grants reviewing courts the power to reduce the sentence imposed by the trial court. (107 Ill. 2d R. 615(b)(4).) The imposition of a sentence is a matter of judicial discretion and, absent an abuse of discretion, the sentence of the trial court will not be altered on review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The record reveals no abuse of discretion; rather, it indicates the trial court considered a variety of factors in sentencing defendant. The sentence here imposed is not attributable to any improper consideration of the victim's age. The court noted defendant's extensive criminal history suggested he was an unlikely candidate for rehabilitation. Defendant's conduct threatened and could

have caused serious harm if D.W. had been awake and struggled. The fact she was unconscious does not diminish the degrading nature of the crime. The term of 25 years' imprisonment for aggravated criminal sexual assault imposed in this case was proper.

The judgment of the circuit court of Vermilion County is affirmed.

Affirmed.

McCULLOUGH, P.J., and SPITZ, J., concur.